679 So.2d 113 (1996)
Allen H.A. BEGNAUD
v.
DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, Linda Easley and GEICO.
Linda Page EASLEY
v.
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT.
Nos. 95-CA-714, 95-CA-715.
Court of Appeal of Louisiana, Fifth Circuit.
February 14, 1996.
Rehearing Denied April 17, 1996.
Writ Denied June 21, 1996.
Richard P. Ieyoub, Attorney General, Owen Murrah Goudelocke, and Edward M. Campbell, Assistant Attorneys General, Division of Risk Litigation, Baton Rouge, for Defendant/Appellant.
Blake G. Arata, Jr., C. Perrin Rome, III, Metairie, and William T. D'Zurilla, New Orleans, for Plaintiffs/Appellees.
Before BOWES and WICKER, JJ., and REMY CHIASSON, J. Pro Tem.
*114 WICKER, Judge.
This appeal arises from two petitions for damages which were consolidated by the trial court. A separate judgment was rendered in each proceeding. This opinion addresses the appeal taken in the proceeding entitled Allen K.A. Begnaud v. Department of Transportation and Development, Linda Easley, and Geico, No. 95-CA-714. We have rendered a separate opinion this date in the proceeding entitled Linda Page Easley v. State of Louisiana, Department of Transportation and Development, No. 95-CA-715.
The original petition was filed by the plaintiff/decedent, Allen H.A. Begnaud (Begnaud). Upon Begnaud's death the petition was amended to substitute his children, Douglas James Begnaud (Douglas) and Gidget Lynn Begnaud (Gidget), as plaintiffs. The substituted parties assert survivorship and wrongful death claims arising from a one-vehicle car accident in which Begnaud was a guest passenger. The State of Louisiana, through the Department of Health and Human Resources, filed an intervention seeking to recover payment for medical services provided to Begnaud under La.R.S. 46:8.
Trial was bifurcated and a determination of liability has become final.[1] This appeal arises from a second trial as to quantum. Following the second trial on quantum, the trial judge rendered a judgment on April 27, 1995 in favor of Gidget and Douglas against Linda Easley (Easley) and the Department of Transportation and Development (DOTD) in solido for the following amounts for the survival action: $1,750,000 for physical and mental pain and suffering from June 15, 1986 to December 31, 1992; $304,432.77 for medical expenses, and $156,000 for lost wages from June 15, 1986 through December 31, 1992.
On the wrongful death claim, the trial judge rendered judgment in favor of Gidget against Easley and DOTD, in solido, for $150,000 for loss of love and affection as well as mental pain, suffering and distress from the wrongful death. She rendered judgment in favor of Douglas against Easley and DOTD, in solido, in the amount of $75,000 for loss of love and affection as well as mental pain, suffering and distress from the wrongful death.
The trial judge granted judgment in favor of DOTD against Easley for its pro rata share of 65% of the judgment rendered. She also rendered judgment in favor of the intervenor in the amount of $102,456.23 for medical services provided to Begnaud from June 15, 1986 to December 31, 1992.
Begnaud was hospitalized in LaPlace, Louisiana at River Parishes Hospital immediately following the accident from June 15, 1986 to July 30, 1986. Thereafter, he was transferred for further hospitalization in Lafayette, Louisiana at University Medical Center (UMC) from July 30, 1986 to August 22, 1986. He was hospitalized at Our Lady of Lourdes Hospital in Lafayette, Louisiana October 10, 1989 to October 11, 1989; October 14, 1989 to October 20, 1989; November 17, 1989 to November 22, 1989 and July 3, 1990 to July 9, 1990. He was again hospitalized at UMC November 23, 1992 to December 25, 1992 and December 29, 1992 to December 31, 1992. He died on December 31, 1992. DOTD now appeals. DOTD does not dispute the finding by the trial judge that Begnaud was seriously injured in the accident, nor that his medical expenses incurred at River Parishes Hospital and at UMC immediately following the accident were accident related. DOTD does dispute the medical expenses, including those related to his death, incurred after his release from his initial stay at UMC as related to the accident. It also disputes the award for lost earnings. DOTD argues Begnaud's general damage award of $1,750,000 should be reduced to $250,000 for approximately one year *115 of pain and suffering; medical expenses should be reduced from $304,432.77 to $213,348.83; and the damages awarded of $156,000 for lost wages should be stricken.
DOTD has also briefed the issue of the effect of the approval of the amendment to Article XII, Section 10(C) of the Constitution of Louisiana, and the provisions of 1995 Act No. 828. DOTD suggests the effect is to impose a $500,000 cap on Begnaud's general damages. We affirm.

MEDICAL TREATMENT: RIVER PARISHES HOSPITAL

6/15/86-7/30/86
Dr. K.E. Matthew, an expert in general surgery, testified he was Begnaud's admitting and discharge physician. He stated Begnaud sustained the following injuries which were a direct result of the motor vehicle accident: (1) multiple trauma; (2) multiple fractures of the pelvis; (3) multiple tears of the bladder; (4) multiple lacerations of the small bowel; (5) partial tear of the sigmoid colon; (6) several fractures of the right femur; (7) extensive intra peritoneal bleeding; (8) perineal hematoma, and (9) multi organ failure.
Other specialists were consulted during his stay. These included Dr. Roy A. Kelly, Jr., a urologist, and Dr. V.J. Zeringue, an orthopedic surgeon. On the date of his admission three surgical procedures were performed. Dr. Matthews performed an exploratory laparotomy, evacuation of blood from the peritoneal cavity, a segmental resection of the small bowel, and repair of the lacerations of the sigmoid colon. Dr. Kelly repaired the urinary bladder and placed a suprapubic cystostomy tube in the bladder. He testified the urological problems for which he treated him were the result of the accident. He last saw Begnaud July 25, 1986 and did not feel he was recovered that date from urological problems. He thought there was a "very good chance that he would have future urological problems" although he expected him to return to normal. He estimated Begnaud had a 50/50 chance of having further urological problems. On the date he last saw Begnaud, July 25, 1986, he had not yet recovered from his urological problems.
Dr. Zeringue testified Begnaud had several fractures. These were: (1) L-5 in the spinal column; (2) fractures of the pelvis; (3) fracture and dislocation of the right sacroiliac joint, and (4) several fractures of the right femur.
Dr. Zeringue treated the fractured femur by surgically inserting a pin through the distal thigh or femur bone and applying traction to the pin. He also removed fracture fragments. Upon discharge from the hospital Begnaud was still in traction. As soon as he was stable, Dr. Zeringue recommended additional surgery to insert a plate and screws. However, Dr. Zeringue did not perform this additional surgery since Begnaud was transferred to another hospital.
Dr. Kelly testified that on July 4, 1986 Begnaud's abdominal surgical wound opened. He and Dr. Robicheaux surgically repaired the wound dehiscence that date.
Begnaud remained in critical condition from June 15, 1986 to July 21, 1986. He was on artificial life support from June 15, 1986 until July 8, 1986. On June 16, 1986 a pulmonologist was called in because Begnaud developed fluid in his lungs. Dr. Matthews was concerned he was developing Adult Respiratory Distress Syndrome (ARDS), where massive amounts of fluid in the lungs can be deadly. Dr. Farida Baig, an expert in internal medicine and nephrology, testified he saw Begnaud on June 19, 1986. He diagnosed him as having acute renal failure, septicemia and ARDS. Begnaud was given dialysis and transfusions of blood. Dialysis was begun because he went into kidney failure six days after the accident. Dr. Baig stated the above conditions for which he treated him were a direct result of the accident.
Dr. David J. St. Germain's deposition was introduced into evidence. He testified as an expert in internal medicine. Dr. Matthew testified that during his stay he was given multiple blood transfusions because of massive amounts of blood loss. Dr. St. Germain also testified to the multiple transfusions as well as to treating him for the failure of his blood to clot. Dr. St. Germain related all of *116 these conditions to be a result of the accident. He testified that upon transfer Begnaud's risk of immediate death was relatively low, but recurrent infection could set in. He was also uncertain as to the degree of return of kidney function at transfer.
Begnaud also suffered severe infections. On July 15, 1986 he took a turn for the worse. On July 26, 1986 Dr. Matthews performed a left tube thoracostomy. This procedure involved placing a tube into the left chest cavity. 1200 c.c. of clear fluid was evacuated on that date and another 1400 c.c. was evacuated on July 27, 1986.
Dr. Matthew testified Begnaud was stable on the date of transfer but that he was still ill and had multi-system injuries. He was not fully recovered and still needed active treatment. He did not know at the time of discharge whether Begnaud would suffer permanent injuries.

MEDICAL TREATMENT: UMC

7/30/86-8/22/86
Dr. Brent C. Ardoin, an expert in internal medicine, testified by deposition. He stated he treated Begnaud during his initial stay at UMC Begnaud was transferred to this hospital for continued and prolonged care. His diagnosis was: (1) acute tubular necrosis resolving in polyuric phase; (2) intertrochanteric fracture of the right hip; (3) malnutrition related to weakness and/or hospitalization from accident; (4) hepatitis non-A, non-B, and (5) hypertension, benign.
He stated Begnaud probably contracted hepatitis from the blood transfusions necessitated by the surgery resulting from the accident. He explained:
hepatitis is an infection or inflammation of the liver ... Non-A, non-B back in '86 was... denoted for those hepatitises that were neither A nor B. At that time, we could only measure for an A or a B, so anything that was different was non-A, non-B. And these are generally transfusion related hepatitis. Nowadays, we have hepatitis C because we can test for it ...
Dr. Chad William Millet, an orthopedic surgeon, testified he first saw Begnaud in August 1986. He performed surgery on August 12, 1986, placing a compression hip screw and a side plate. He did not know whether the hardware he placed was ever removed. He last saw Begnaud on August 14, 1986. Dr. Millet stated these are painful injuries and the hip fracture he treated and operated on was a direct result of the accident. He did not have the opportunity to follow Begnaud, but if he had performed this procedure in private practice he would follow the patient for more than the 10 days he followed Begnaud.
Dr. Ardoin testified Begnaud was discharged on medication. He was scheduled to return for orthopedic and genitourinary consultation within the next month, and to see Dr. Ardoin in three weeks. Dr. Ardoin last saw him on the date of his discharge.

MEDICAL TREATMENT: PRIOR TO LAST ADMISSIONS TO UMC

11/17/86-7/13/90
Begnaud returned to see Dr. Zeringue on November 17, 1986. On that date all areas of fracture were healing well. He complained of frequent urination, burning and pressure feeling, pains in the right femur and the pelvic region. On examination Dr. Zeringue noted the following: decreased range of motion in right hip region, pain, walking with a limp, using cane, range of motion in back was fair, no nerve damage to legs, and some shortening of the right, lower extremity. He recommended a heel pad. The fractures from the accident had resulted in a shortening of the bone of about one inch. The shortening caused increased hip pain.
Dr. Zeringue last saw Begnaud on June 23, 1987. He continued to complain of pain in the low back and right hip region. He had limited motion in the low back. He also noted: some pelvic tilt due to leg length discrepancy, Begnaud walked with limp, Begnaud was wearing heel pads under the right heel. On that date he was still unable to return to work as a brick layer and was 100% disabled from returning to work as a brick layer. The source of his low back pain was related to the healed fracture area around the sacroiliac joint, and leg length discrepancy causing pelvic tilt. He also continued to *117 complain of right hip pain. Dr. Zeringue discussed the possibility of hip replacement with Begnaud. At the time he thought his prognosis was poor and that he would continue to have pain in the low back, need medication periodically, and use heel pads. Dr. Zeringue felt the pain would be permanent. When he last saw him, he did not think Begnaud would probably ever be able to return to heavy manual labor and would probably permanently require the use of a cane. Dr. Zeringue thought Begnaud could return to some type of lighter work duty but had not released him to work when he last saw him. He stated the cause of the injuries were due to the automobile accident. Even though he had shown improvement he still did not reach his pre-accident orthopedic function; improvement did not mean he was healed.
Dr. Gary David Frentz, a specialist in urology and renal transplants, treated Begnaud from mid-December 1986 until July 24, 1987 for urinary problems. After his discharge from UMC he continued to complain of severe pelvic pain which was incapacitating. At the time he saw him he complained of blood in the urine. Begnaud also complained of frequent urination and burning. Begnaud had an abnormal urine specimen indicating either inflammation or infection within the urinary tract. He also showed tenderness over the bladder. He performed a cystogram which showed some leakage of the dye used in the test. A cystoscopic examination revealed an abnormality. It showed a pocket in the bladder. Dr. Frentz noted some debris within the area. It was a pouch acting like a stagnant pool trapping debris in this abnormal site. He recommended surgery to eliminate this chronic source of infection. He felt the urinary tract was contributing to Begnaud's pain symptoms.
He testified it would probably be difficult for Begnaud to have any type of meaningful employment until he had his urinary tract condition corrected. Begnaud, however, told him he had no insurance and would have to seek treatment elsewhere. Dr. Frentz stated that even with surgery "one could not say with any degree of certainty, that if this procedure was done, that the patient would have normal bladder capacity and completely normal urinary habits in the future." He felt it would be very difficult for him to gain any gainful employment because of sleep deprivation from frequent urination at night. Dr. Frentz diagnosed him as having some type of a traumatic bladder diverticulum that was the source of chronic urinary tract irritation and/or infection. He stated he had no doubt that the out pouching of the bladder forming the stagnant pool was directly related to the accident.
Dr. Albert Wayne Beacham, a urologist, testified he first saw Begnaud October 2, 1989. On that date he had marked frequency of urination, burning and painful urination, and blood in the urine. Dr. Beacham diagnosed him as having a urinary tract infection. He did a cystogram and an endoscopic examination noting an abnormality of the bladder or out pouching. He felt this abnormality was the source of bleeding and infection. On October 10, 1989 he admitted him to Our Lady of Lourdes Hospital (Lourdes), in Lafayette, Louisiana for surgery. He endoscopically resected a tumor and took biopsies of the remainder of the bladder. He was discharged from the hospital the following day with an inlying catheter.
Begnaud began bleeding from the procedure and was readmitted to the hospital. Dr. Boudreaux, another urologist, surgically evacuated blood clots. He remained in the hospital until October 20, 1989.
Dr. Beacham diagnosed Begnaud as having an extremely rare condition called nephrogenic adenoma, a tumor. He explained it is the consensus of all experts that this condition is caused by smoldering chronic urinary tract infection. He explained:
Any time you have a multiple fracture of the pelvis, and a bladder perforation with devastation of the urine, in the healing process you're going to have development of intensive scar. Just to get to the bladder itself is difficult. Once you get to the bladder and you open it, what I found, that I had not previously diagnosed is he had a little partition in his bladder, secondary to his adhesion that gave it an hour-glass type configuration. Constriction being that intervascular adhesion.
*118 He was asked if to a reasonable degree of medical certainty nephrogenic adenoma would have been brought about as result of infection from injury that Begnaud suffered in the accident and subsequent medical complications. Dr. Beacham replied, "unequivocally. Yes, sir." He thought the tumor was related to the diverticulum that harbored chronic infections and that the diverticulum was secondary to the perforation of the bladder sustained in the accident.
Begnaud had another operation on November 17, 1989 at Lourdes by Dr. Beacham. He was discharged November 22, 1989 although Dr. Beacham would have kept him longer. The reason for the early discharge was because Begnaud was in a financial bind. Dr. Beacham continued to treat Begnaud until July 13, 1990. He had a one-day surgery July 3, 1990 at Lourdes for a severe stricture within the penile tube. This stricture was caused by the tubes, cystoscopes, and catheters that had been used in treating him. The stricture surgery was successful.
Dr. Beacham testified the urological injuries for which he treated him which resulted from the accident were painful injuries and that some of these injuries were permanent. Begnaud was permanently urologically damaged and could never go back to heavy, manual labor. At the most he could perform sedentary labor. However, as of June 21, 1990 he was still complaining of urinary frequency with getting up at night.
Dr. Fred Webre's written report was in evidence. That report dated March 19, 1990 is addressed to Disability Determinations. The report consists of an orthopedic evaluation. He reported:
This man has had rather significant injury to the right pelvis with disruption of his sacro-iliac joint on the right side. He still has a right limp favoring his right lower extremity, probably because of his pelvis rather than the femur itself that is now solidly healed.
I would think this man could do sedentary type work, but he would not be able to be on his feet more than two or three hours at a time.

TREATMENT: LAST ADMISSIONS TO UMC

11/23/92-11/25/92 AND 12/29/92-12/31/92
From July 13, 1990 until November 23, 1992 Begnaud did not seek medical treatment. On November 23, 1992 he was admitted to UMC with complaints of abdominal pain. Dr. Joseph Algin Badeaux, an expert in general surgery, testified he treated him from November 23, 1992 until his discharge of December 25, 1992. A CT scan and liver function tests showed liver failure, a very enlarged and tender liver, and a mass in the right upper quadrant of the abdomen. Extensive scar tissue/adhesions from his previous abdominal surgery prevented the doctors from completing an endoscope of the small bowel. An attempt was made to remove his gallbladder on December 8, 1992 but this failed because the extensive adhesions prevented a clear view of the organ. The adhesions and scarring were obviously from his abdominal operations. A biopsy showed hepatitis C.
Since Begnaud and his family wanted him home for Christmas, he was discharged. However, he had progressive, incurable liver failure and progressive incurable Hepatitis "C." He was dying. Dr. Badeaux thought Begnaud definitely contracted hepatitis C based upon his very high risk exposure to blood products.
Dr. Nicholas Hugh Frugé, Jr.'s deposition was introduced into evidence. He is a specialist in family practice. He first saw Begnaud on December 29, 1992 when he was readmitted to UMC. His initial diagnosis was liver and renal failure. Begnaud was dying and died December 31, 1992 of renal and hepatic failure. The biopsy revealed post necrotic cirrhosis and chronic active hepatitis. Dr. Frugé stated the cause of his death was probably initially hepatic failure and that was probably as a result of the chronic active hepatitis. The cause of the hepatitis was probably from multiple blood transfusions as a result of the accident. Dr. Frugé was aware Begnaud had a history of alcohol abuse. However, he felt his primary liver problem was hepatitis and not alcohol abuse. He was shown initial lab tests done at River Parishes Hospital which indicated *119 Begnaud tested antibody positive for hepatitis A and B. He explained this showed he did have them in the past, but that he was absolutely negative for active hepatitis at the time of the test. In his opinion, Begnaud did not have hepatitis Non-A, Non-B, or C at the time of his accident.
Dr. Sangeeta Shah's deposition was also introduced. She testified as an expert in the field of pathological medicine. She performed the liver biopsy at UMC in 1992. She stated Begnaud's death was definitely caused by liver and renal failure. She never treated Begnaud. She reviewed the history and records, including the record of a 1985 treatment at UMC, predating the accident, and explained:
[W]hat I'm saying is that looking at the entire record, that the patient did have abnormal liver diseaseabnormal liver function, before the hospitalbefore the accidentduring his first admission, that established that the patient did have some alcohol-related liver disease; because he did admit both the times when he was admitted to the hospital, LaPlace Hospital, as well as admission at the UMC in 1985 that he did abuse alcohol.
And he had all the symptoms of having alcohol liver disease, because his liver was very large on examination in his first admission, 1985. His liver was very large.
You don't get large liver on a one use of alcohol overnight. You might get abnormal liver function, but you are not going to have a large liver which is half size of the abdomen, filling half of your abdomen.
So that means he did have extensive liver disease at that time, and probably because his liver was enlarged that much he had a lot of fatty changes in his liver. So from that dataand he could also possibly have developed hepatitis. If you already have an insult on your liver, and the liver is already abnormal, having another source of infection like a viral hepatitis, could expedite the process and cause his failure.
She stated:
[The] major contributing factor [to his death] could be his alcoholic preexisting condition. And having hepatitis C could have causedcombining the two together, expedite the failure of the liver.

TESTIMONY OF BEGNAUD AND FAMILY
Begnaud's deposition was introduced into evidence. He testified in 1988 that he had not been able to work since the accident. His only income was social security disability. He stated he tried to work with his brother-in-law but each time he worked one-half hour he ended up spending two days in bed.
Begnaud stated he attended school only until the 10th grade. He worked primarily as a brick layer from that point onward. At the time of the accident he was laying brick and block for River Region Masonry in the New Orleans area, earning $13.00 per hour. After the accident he could no longer enjoy fishing or hunting as he once did because of the pain in his leg.
His sister, Elizabeth Gail Arceneaux (Arceneaux), testified at trial. She was very close to her brother. She testified he worked as a brick layer before the accident but did not know how much money he made. She described a history of pain following the accident. She explained that the reason he did not seek medical attention from July 1990 until November 1992 was because he could not afford to do so. He received financial assistance for a while but then was asked to repay more than $7,000. He could not do so because he was unable to work. There were times he needed medical attention. He wouldn't go to UMC because he associated suffering so much there. He also feared surgery because he was afraid he would not wake up.
Following the accident he tried working but was unsuccessful because of difficulty controlling urination, bending and pain.
Douglas, Begnaud's son, testified he was close to his father. He enjoyed hunting and fishing with him. After the accident, however, his father could no longer go deer hunting because he could not walk long enough. He could also not go fishing in a boat because of a lack of bladder control.
*120 Gidget, Begnaud's daughter, also testified the family was close. Both she and Arceneaux attended Begnaud when he was hospitalized. She stated that upon his transfer to UMC, her father was no longer in traction in the UMC emergency room. He was in pain and crying at this time. Furthermore, during the initial stay at UMC, he wet and soiled his bed linen frequently. Both she and Arceneaux assisted in cleaning him because of accidents occurring six to eight times a day. He felt it degrading that they cleaned him.
Gidget testified that he stopped seeking medical care because he could not afford it. However, he continued to take "Advil, Ibuprofin, and Tylenol" for pain. She stated he tried to resume working as a brick layer the last year of his life when his social security disability ended. However, he could not climb or bend because of pain. His leg would also give out on him when he placed his weight on it. He could no longer hunt, fish, or garden after the accident. As of the date of trial she was still affected by her father's suffering and death.

DAMAGES
DOTD recognizes Begnaud suffered "rather intense pain and suffering during the first four to six weeks following the accident." However, DOTD views Gidget's testimony of a "horror" story upon his admission to UMC to be exaggerated, not supported by the record, and a relating of circumstances the state could not have foreseen. Appellant refers to a note that upon transfer Begnaud was improving. However, the medical testimony is that Begnaud was stable to transfer but was not well at this time. He still continued to need active treatment. Furthermore, the nurses' notes at UMC do indicate that Gidget was correct in testifying Begnaud was out of traction in the emergency room. Upon transfer from River Parishes he left that hospital in traction. There is also nothing in the UMC records to dispute her testimony he wet and soiled the bed requiring frequent change of linen and clothing.
Appellant argues that the cause of death was not attributed to hepatitis contracted from blood transfusion and that the only physician who considered Begnaud's history of alcoholism was Dr. Shah. DOTD also views Dr. Shah's testimony as attributing his liver disease and subsequent death to alcoholism. We disagree.
Dr. Frugé considered Begnaud's history of alcohol abuse. However, he stated the cause of his death was probably initially hepatic failure and that was probably as a result of the chronic active hepatitis. The cause of the hepatitis was probably from multiple blood transfusions as a result of the accident. He stated the cause of his death was probably initially hepatic failure and that was probably as a result of the chronic active hepatitis. Dr. Badeaux thought Begnaud definitely contracted hepatitis C based upon his very high risk exposure to blood products. Dr. Ardoin stated Begnaud probably contracted hepatitis from the blood transfusions necessitated by the surgery resulting from the accident. On the other hand, Dr. Shah viewed his death as resulting from a combination of an alcoholic pre-existing condition and hepatitis C.
The trial judge concluded Begnaud contracted hepatitis as a result of blood transfusions necessitated by the injuries from the accident and that hepatitis ultimately led to hepatrorenal failure. She also noted that even if Begnaud had a pre-existing liver disease DOTD would not be free of liability since a tortfeasor must take his victim as he finds him. In Lasha v. Olin Corp., 625 So.2d 1002 (La.1993), at 1005-1006, the Supreme Court held:
A defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct... When the defendant's tortious conduct aggravates a pre-existing condition, the defendant must compensate the victim for the full extent of the aggravation.
DOTD argues that even if it were proven Begnaud contracted hepatitis from blood transfusions the state had no duty to protect him from such an occurrence. It also argued the tainted blood would be an intervening and superseding cause.
The Supreme Court has held that duty/risk analysis applies in determining legal causation. *121 Weber v. Charity Hosp. of Louisiana at New Orleans, 475 So.2d 1047 (La.1985). In Weber the victim of an automobile accident contracted hepatitis while receiving several blood transfusions during treatment for injuries from the accident. The Weber court held at 1050:
The host driver's negligence was a cause in fact of Gaynell's contracting of hepatitis, since the blood transfusion would not have been necessary but for the original injury caused by the negligence. Once causation in fact is established, the next step in determining liability is to determine what duty was imposed under the circumstances and whether this particular risk was within the scope of the protection extended by the imposition of that duty. Pierre v. Allstate Insurance Co., 257 La. 471, 242 So.2d 821 (1970). The duty on the host driver to refrain from causing injury to another by the negligent operation of her vehicle encompassed the risk that the tort victim's injuries might be worsened by the treatment for those injuries. Moreover, there is an ease of association between the injury and the rule of law which gave rise to the duty. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972). We therefore conclude that the host driver was liable for any damages resulting from the blood transfusion, along with any other parties whose fault caused Gaynell Weber to contract hepatitis [emphasis in original.]
Accord, Younger v. Marshall Industries, Inc., 618 So.2d 866 (La.1993); Jones v. St. Francis Cabrini Hosp., 94-2217 (La. 4/10/95), 652 So.2d 1331.
Thus, we find no merit to this argument.
DOTD argues the evidence does not support the finding that Begnaud was in constant pain after his release from his initial hospitalization at UMC. It also contends Begnaud's failure to seek medical attention for two years prior to his death also indicates he was not in constant pain. Begnaud's failure to seek medical attention was explained by Arceneaux, himself and Gidget on the basis he could not afford it. Gidget further testified he continued to take pain medication in the interim.
Appellant also urges that since there is some testimony Begnaud was not at risk for death at the time he was discharged from River Parishes and at UMC on his initial admission, that his death was not caused by the accident. We are not persuaded by this argument since the evidence shows otherwise. Furthermore, Dr. St. Germain testified that upon transfer to UMC Begnaud's risk of immediate death was relatively low, but he was also uncertain as to the degree of return of kidney function at transfer.
DOTD also refers to Dr. Matthew's testimony that he could not say Begnaud suffered permanent injuries. Dr. Kelly stated there was a 50/50 chance he would have further urological problems. Dr. Zeringue documented further urological problems November 17, 1986 when Begnaud complained of frequent urination, burning and pressure feeling to him. Dr. Beacham stated that urological injuries from the accident were permanent. Dr. Zeringue felt the orthopedic-related pain would be permanent. He explained that even though he had shown improvement he still did not reach his pre-accident orthopedic function; improvement does not mean he was healed.
We are not persuaded by DOTD's argument that Dr. Beacham had difficulty attributing Begnaud's condition of nephrogenic adenoma to the accident since his testimony shows otherwise.
DOTD also argues that Dr. Webre found Begnaud fit for sedentary work. However, Dr. Webre noted a significant limitation on Begnaud's being employed full time. He stated, "I would think this man could do sedentary type work, but he would not be able to be on his feet more than two or three hours at a time." Begnaud's difficulty working after the accident is consistent with Dr. Webre's report. Additionally, from a urological standpoint, Dr. Beacham viewed him as permanently urologically damaged and could never go back to heavy, manual labor. Dr. Beacham documented continued problems with frequent urination the last time he saw Begnaud. Furthermore, Dr. Frentz testified it would probably be difficult for Begnaud to have any type of meaningful employment until he had his urinary tract condition corrected. *122 Even with surgery Dr. Frentz could not say he would have normal bladder capacity. He felt it would be very difficult for Begnaud to gain any gainful employment because of sleep deprivation from frequent urination at night.
We conclude the trial court's findings are reasonable based upon the entire record of evidence and there is no manifest error. Lewis v. State Through Dept. of Transp. And Development, 94-2370 (La. 4/21/95), 654 So.2d 311.
DOTD also disputes the award of loss income as contrary to the evidence since Begnaud had filed no tax returns for the three years prior to the accident, based on his answers to interrogatories. Additionally, DOTD contends the only evidence as to loss of income was from Arceneaux who testified she did not know how much he made a year. Thus, DOTD argues the report of Begnaud's economist, Pat Culbertson (Culbertson), should be ignored as based on speculation. However, Begnaud testified he earned $13.00 an hour on his last job prior to the accident. That testimony was uncontradicted. Culbertson based his figures for lost earnings on Begnaud's being employed as a brick mason earning approximately $12.00 per hour. He calculated his earnings for a 40-hour week with no overtime, assuming a 50-week year. Based on an annual earnings of $24,000 he calculated his lost earnings from the date of the accident to the date of his death to be $156,000.00. We find no manifest error or abuse of discretion in the trial judge's reliance on Culbertson's report.

CONSTITUTIONAL AMENDMENT
This court granted DOTD leave to file a supplemental brief addressing the issue of the effect of the October 21, 1995 voters' approval of the amendment to LA. CONST. Art. XII § 10(C) and the provisions of Acts 1995, No. 828. We also permitted all parties to address the issue.
In the present case the accident occurred in 1986. Judgment was rendered in April 1995. In 1975, although the constitution did not specify a cap on general damages, the legislature enacted La.R.S. 13:5106, imposing a cap. However, that legislative imposition of a cap was held unconstitutional in Chamberlain v. State Through DOTD, 624 So.2d 874 (La.1993), since it contravened Article XII, § 10's proscription against sovereign immunity. DOTD now argues that since the impediment of unconstitutionality has been removed, prior La.R.S. 13:5106 is now operable and the impediment to having a cap on general damages was removed.
The newly approved constitutional amendment provides[2] in pertinent part:
Limitations; Procedure; Judgments. Notwithstanding Paragraph (A) or (B) or any other provision of this constitution, the legislature by law may limit or provide for the extent of liability of the state, a state agency, or a political subdivision in all cases, including the circumstances giving rise to liability and the kinds and amounts of recoverable damages. It shall provide a procedure for suits against the state, a state agency, or a political subdivision and provide for the effect of a judgment, but no public property or public funds shall be subject to seizure. The legislature may provide that such limitations, procedures, and effects of judgments shall be applicable to existing as well as future claims ...
The constitutional amendment does allow the legislature to impose a cap on "existing claims." However, the legislature did not apply the cap to existing claims. Instead, it enacted Act 828[3] which provides in pertinent part as follows:
Section 2. R.S. 13:5106 is hereby amended and reenacted and R.S. 13:5112 and *123 5114 are hereby reenacted to read as follows:
Sec. 5106. Limitations
B. (1) In any suit for personal injury, the total amount recoverable, exclusive of medical care and related benefits and loss of earnings, and loss of future earnings, as provided in this Section, shall not exceed the limit of liability in effect at the time of judicial demand. On the effective date of this Subsection, the limit of liability shall be seven hundred fifty thousand dollars. Beginning January 1, 1997, and on that date every year thereafter, the limit of liability shall be the limit established annually by the commissioner of financial institutions as set forth in Paragraph (3) of this Subsection.
(2) In any suit for wrongful death, the total amount recoverable, exclusive of medical care and related benefits and loss of earnings or loss of support, and loss of future support, as provided in this Section, shall not exceed the limit of liability in effect at the time of judicial demand. On the effective date of this Subsection, the limit of liability shall be seven hundred fifty thousand dollars. Beginning January 1, 1997, and on that date every year thereafter, the limit of liability shall be the limit established annually by the commissioner of financial institutions as set forth in Paragraph (3) of this Subsection. [Emphasis added.]
Former La.R.S. 13:5106(B)(1) stated:
In any suit for personal injury, the total amount recoverable, exclusive of medical care and related benefits and loss of earnings, and loss of future earnings, as provided in this Section, shall not exceed five hundred thousand dollars.
The new provision, unlike the former one, now specifies the effectiveness date for the imposition of the cap to be the date at the time of judicial demand. On the date of judicial demand in this case there was an impediment to enforcing the former La.R.S. 13:5106, later held unconstitutional by Chamberlain. At the time of judicial demand there was an invalid statute so there was no cap.
The Supreme Court has dealt with the issue of the effect of a constitutional amendment which makes valid what was previously determined to be an unconstitutional statute. Long v. Insurance Co. of North America, 595 So.2d 636 (La.1992).
In Moore v. Roemer, 567 So.2d 75 (La. 1990) the Supreme Court held as unconstitutional the portions of the 1988 Act No. 938 which divested district courts of original jurisdiction of worker's compensation claims. The Moore court concluded the act violated LA. CONST. Art. V, § 16(A). That judgment became final and definitive two days before the electorate voted to approve a constitutional amendment approving such jurisdiction.
The argument was made in Long that the subsequent constitutional amendment validated the hearing officer system of adjudication. In determining whether the subsequent constitutional amendment retroactively validated the prior unconstitutional statute, the court looked to the intent of the legislature and applied the following test [following Plebst v. Barnwell Drilling Co., 243 La. 874, 884-85, 148 So.2d 584, 588 (1963)]:
[I]t is equally well settled that statutes, in conflict with the constitution at the time they are passed, are validated by a constitutional amendment which expressly ratifies and confirms them and they may be given retrospective effect "... provided such validation does not impair the obligations of a contract or divest vested rights." [Citations omitted; emphasis added].
Id. at 639.
In the instant case the constitutional amendment does not expressly ratify the prior law. Instead, it gives the legislature the discretion to apply the cap "to existing as well as to future claims." LA. CONST. Art. XII, § 10(C), as amended 1995. In Long the court looked to the intent of the legislature.
In the Long case the intent of the legislature was to give retroactive validation. Additionally, the court also held that the retroactive application of the prior law did "not result in an impairment of contractual obligations *124 or a loss of vested rights." Long at 639.
Applying the Long principles to the present case, we conclude the intent of the legislature in enacting Act 838 was to make the triggering date for the cap to be the date of judicial demand. As discussed infra there was no cap in the present case on that date. We conclude the $500,000 cap does not apply.
Accordingly, for the reasons stated, the judgment is affirmed.
AFFIRMED.
NOTES
[1] For a discussion of the prior appellate history see our opinion in In Begnaud v. Dept. Of Transp. & Dev., 93-639, 93-640 (La.App. 5th Cir. 1/12/94), 631 So.2d 467, writ denied, 94-0367 (La. 3/25/94), 635 So.2d 230, where this court affirmed the trial judge's liability finding as follows at 468-469:

After the trial on liability, the trial court awarded judgment in favor of Begnaud and against Easley and DOTD, in solido, and allocated 65% fault to Easley and 35% fault to DOTD. The trial court also granted judgment in favor of Easley and against DOTD, with fault allocated 65% to Easley and 35% to DOTD.
[2] The proposition before the electorate provided:

To authorize the legislature by law to limit or provide for the extent of liability of the state and its agencies and political subdivisions in suits against them in tort or contract or in other cases, including the circumstances for liability and the kinds and amounts of recoverable damages, and to provide that those limitations and other procedures in such suits apply to existing claims as well as future claims. (Amends Article XII, Section 10(C)).
[3] Approved June 27, 1995 and to become effective if and when the amendment became effective.