WICKER, Judge.
This appeal arises from two petitions for damages which were consolidated by the trial court. A separate judgment was rendered in each proceeding. This opinion addresses the appeal taken in the proceeding entitled Linda Page Easley v. State of Louisiana, Department of Transportation and Development, No. 95-CA-715. We have rendered a separate opinion this date in the proceeding entitled Allen H.A. Begnaud v. Department of Transportation and Development, Linda Easley, and Geico, 679 So.2d 113 (La.App.1996). That opinion notes the prior appellate *125 history of these bifurcated matters on the issues of liability and quantum.
Linda Page Easley[1] filed a suit against the State of Louisiana, Department of Transportation and Development (DOTD) for injuries from a one-vehicle car accident. DOTD filed a cross claim against Easley for contribution. Trial was bifurcated and a determination of liability has become final. This appeal arises from a second trial as to quantum.
Following the second trial on quantum, the trial judge rendered a judgment on April 27, 1995 in favor of Easley and against DOTD in the amount of $350,000 for physical and mental pain and suffering, and $64,038.26 for medical expenses, subject to a reduction for IsEasley’s 65% fault.
DOTD now appeals the award of damages on the basis these were not proven by Eas-ley.
The evidence regarding Easley’s damages consisted of her testimony, Dr. V.J. Ze-ringue’s testimony and Dr. K.A. Matthews’ testimony, as well as various medical records and bills. A review of the medical records from River Parishes Hospital and the testimony of Dr. Zeringue reveals that Easley was admitted to River Parishes Hospital on June 15, 1986 having been brought to the hospital from the scene of the accident. She was 43 years of age at the time. She was an inpatient in the hospital from June 15, 1986 to July 27, 1986. The admit and discharge notes were signed by Dr. Matthew who indicated the following diagnoses:
1. Multiple Trauma
2. Blunt Trauma to chest with multiple rib fractures on both sides
3. Multiple lacerations of the face and extremities
4. Fracture right femur
5. Compound fracture/disloeation of right ankle
6. Fracture pelvis left superior and inferi- or ramii
Dr. Matthew described her past medical history as “remarkable.” He wrote:
Pt. Had a multitude of surgeries for different types of cancers which include malignant melanoma on the right arm, melanoma over the back, carcinoma of the cervix, carcinoma of the ovary and tubes and resection of portion of the colon for infiltrating cancer, probably from the ovary, chemotherapy following the ovarian cancer surgery, degenerative disease of the right hip following massive steroid therapy ...
While in the hospital she had surgeries on June 15, 1986 and June 20, 1986. Dr. Matthew repaired lacerations to her face and right upper eyelid. Dr. Bihan Motaghedi repaired her septum which had been pulled away from her nasal bone. A fracture of the nasal bone was noted on x-rays taken July 16, 1986. Dr. Zeringue’s first surgery consisted of a repair of her ankle, placing a pin through the right tibia or bone right below the knee joint to apply traction for a fractured femur which was also fractured. Dr. Zeringue placed her in a cast following this surgery. While hospitalized immediately following the accident, she was also treated by Dr. Terrence D’Souza, a neurologist, on July 2, 1986 for headaches. He diagnosed these as “most likely” postconcussional with some evidence of a stress component. An EEG taken July 22, 1986 and interpreted by Dr. D’Souza indicates a normal reading.
Dr. Zeringue performed a second operation on June 20, 1986 for the femur, that is, the Uthigh bone. At that time a pin was removed and a rod was placed through the inside part of the femur bone. At this surgery he also operated on the right ankle and placed orthopedic hardware across the fracture sites.
She was described in the medical records as having a “steady but slow improvement in the postoperative period.” She was discharged from the hospital with a walker and was advised to follow up her treatment with Dr. V.J. Zeringue.
Easley testified that after hospitalization she had to stay in a wheel chair about four months because of pelvic fractures. She could not put weight on the right side. She then went to a walker but still could not put *126 pressure on the right side. Ultimately she progressed to crutches and then to a cane. It was probably eight months before she could put pressure on the right side. When home from the hospital she still spent a lot of time in bed because it hurt to sit. It took two years or longer after the accident before she could move around like she does today.
Dr. Zeringue testified he again admitted her to River Parishes Hospital on June 23, 1987 for a one-day surgery in which he operated on her ankle. He placed orthopedic hardware on both sides of the ankle and removed orthopedic hardware on the right ankle.
The only medical testimony presented as to causation was the testimony of Dr. Ze-ringue. He testified he treated her from June 15, 1986 through September 14, 1989. She moved in September 1987 and was seeing other physicians in Texas and Georgia. After her second surgery with him on June 23, 1987 he continued to treat her for complaints of pain in the following regions: right hip, right ankle, right and left wrists, and right knee. He stated the right ankle pain and hip region pain were related to the fractures. He explained it was not unusual for someone with a fractured ankle and a fracture to the fibula area to have knee pain. He thought the knee pain was probably caused by Easley’s walking in an unusual manner and found no objective findings in the knee. He testified the injuries he treated her for were the result of the accident. He also thought she had a disability rating of the whole body related to right hip, right ankle, right knee and wrist discomfort of about 30% or 35% as a result of that accident. However, he did not give a disability rating which took into account her prior history of right degenerative hip disease.
IsEasley admitted she had a prior hip problem- as a result of an infection or inflammation from massive doses of prednisone she took for the treatment of lupus. She sought medical attention for the hip problem in January 1986 and March 1986. She stated it had resolved prior to the accident but that she was still on anti-inflammatory medication given her as treatment for this condition at the time of the accident. She denied ever having a fracture of the hip prior to the accident.
Easley testified she had been treated for Lupus from 1984 through 1989. She admitted having multiple cancers since she was 21 years of age. She stated she has not had any problems with skin cancer for a long time.
She testified that at the time of trial, September 19, 1994, she continued to have problems. She showed the trial judge facial scarring from the lacerations to her face. She stated the nasal injury from the accident interferes with her breathing properly. She is unable to use her hands in normal activity. She walks with a slight limp and sometimes uses a cane or other appliance as an aid in walking.
EASLEY: MEDICAL EXPENSES
DOTD argues that Easley did not meet her burden of proving she incurred any medical expenses related to the accident, or that she proved causation. At trial DOTD timely objected to the admission of medical records and receipts for medical expenses on the basis this evidence did not establish a connexity to the accident. The trial judge agreed the documents could not be used to establish causation, and admitted the documents subject to this limitation. However, the trial judge awarded Easley $64,038.26 in medical expenses, a proportion of which is not supported by the evidence in the record.
Dr. Zeringue’s testimony was the only medical testimony introduced. Dr. Zeringue testified that the multiple injuries for which he treated her were the result of the accident. He also testified his charges for medical treatment resulting from the accident totaled $10,068.
Easley testified that all of the bills introduced into evidence were incurred as a result of her accident. However, an examination of the bills indicates otherwise. These bills total approximately $44,090.23. Our review reveals, inter alia, the following unexplained inconsistencies:
| si. A prescription receipt dated 1991 for a person named “Betty Yates,” not identified with this litigation,
*127 2. Four duplications of prescriptive receipts are included,
3. There are numerous receipts identifying physicians who have not been identified in testimony or the record to have treated her for injuries sustained in the accident,
4. One of the receipts introduced does not give a physician’s name or the medication prescribed,
5. Two prescription receipts do not give the mediation prescribed,
6. Four receipts dated 1988 to 1989 list Prednisone as the medication prescribed, a drug she testified she took for Lupus, a condition unrelated to the accident,
7. A bill to a different hospital than River Parishes Hospital dated the date of the accident,
8. A laboratory bill for a biopsy in 1990,
9. A laboratory bill for a stool culture in 1991,
10. Two prescription receipts dated 1988 and 1989 are for estrogens,
11. One prescription receipt dated 1989 is for “Nix Creme Rinse,”
12. A 1988 bill from a dentist listing a $915.00 estimate for dentures and examination. There is no evidence Easley suffered the loss of her teeth as a result of the accident,
18. A bill from a cardiologist, Dr. Charles Steiner, dated June 30, 1989 without any indication a need for a cardiologist treatment was related to the accident,
14. A bill from West Jefferson Medical Center for a 13-day stay in the hospital from 5/27/89 to 6/09/89 with that admit including charges for an EKG and respiratory care. These charges of $6,972.55 have not been related to injuries sustained in the accident.
We also note that Easley testified she was treated by Dr. Biundo at L.S.U. Medical Center for arthritis. The medical records for Dr. Joseph Biundo at the L.S.U. Medical Center indicate she was seen March 7, 1988 and that Dr. Biundo referred her to rheuma-tology. L.S.U. records indicate she was seen in rheumatology on 7-27-87, 9-5-87, 3-7-88, April 1988 and 6-6-88. However, none of these records give any evidence as to causation or diagnosis.
Dr. Zeringue testified he treated her for wrist problems as a result of the accident. However, he testified she first complained of her left wrist on August 28,1986 but that he saw nothing wrong at the time and that she had satisfactory range of motion. The River Parishes Hospital medical records indicate an x-ray was taken June 16, 1986 of the left wrist revealing “No fracture or other bony abnormality identified.” Dr. Zeringue testified he continued to treat her for complaints of wrist pain and that these were related to the accident; however, he did not elaborate as to a diagnosis for the wrist pain nor did he testify she needed surgery on the wrists. He did not state he treated her for hairline fractures in the wrists or that she needed continued treatment of the wrist condition. In contrast, Easley testified Dr. Zeringue treated |7her for hairline fractures in the wrists and then she continued treatment with Dr. Digrado of Jefferson Parish Orthopedic Clinic. She stated Dr. Digrado performed surgery on her wrists at Meadowcrest Hospital in 1987 or 1988. A bill from Meadowcrest shows an admit date of 8/11/88 with a discharge date of 8/17/88 for a bill of $540.00. Dr. Digrado’s bill was introduced. It lists treatment of the wrist but does not indicate the nature of the diagnosis or whether treatment was accident related. The bill from Meadowcrest does not indicate the reason for the admission.
Easley testified she was treated at L.S.U. and Tulane’s eye clinic for problems from the accident. However, records from these facilities do not establish a causal relationship to the accident. The remaining records introduced into evidence likewise do not establish causation with the exception of the few referred to below.
Dr. Zeringue testified he treated Easley from June 15,1986 until September 14,1989. Two prescription receipts list Dr. Zeringue as the physician and are dated within this treatment period. These total $26.49. Our review indicates the only charges proven to be related to the accident are as follows:
*128 1. Dr. V.J. Zeringue — prescriptions $26.49
2. Dr. V.J. Zeringue — medical services $10,068
3. River Parishes Medical Center for hospitalization from 6/15/86 through 7/27/86— $26,198.85
4. Dr. Bijan Motaghedi’s consult in the hospital on 7/14/86 — $100
5. Dr. M.K. Wadhwa, anesthesiologist for the surgery on 6/20/86 — $412.00
6. Dr. D’Souza, seen by consult from Dr. Zeringue for headaches 7-21-86 through 7-25-86 — $170.00
7. Dr. K. Matthew, Easley’s admitting and discharge physician at River Parishes bill for 6-15-86 through 7-27-86 — $2,150
These figures total: $39,125.34
Here the trial judge made a credibility determination, accepting Easley’s testimony the bills introduced were for treatment of injuries sustained in the accident. The Supreme Court once again explained the manifest error/clearly wrong standard of appellate review in Ferrell v. Fireman’s Fund Ins. Co., 94-1252 (La. 2/20/95), 650 So.2d 742, 746 [following Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989) ]:
When findings are based on determinations regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings; Isfor only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder’s finding is based on its decision to credit the testimony of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
In the instant case much of the documentation contradicts Easley’s testimony. Only $39,125.34 of the medical expenses introduced is consistent with the testimony. We find merit to this specification of error and therefore amend the judgment accordingly.
PAIN AND SUFFERING
The state argues that since Easley did not prove she was injured as a result of the accident, then she also did not prove entitlement to damages for pain and suffering. We disagree. There is uncontradieted testimony from Dr. Zeringue that the injuries he treated her for in River Parishes Hospital were caused by the accident. Dr. Zeringue treated her for these injuries for more than three years following the accident. She suffered serious injuries and underwent five surgical procedures by Drs. Zeringue, Matthews, and Motaghedi. She remained hospitalized following the accident for 42 days. Prior to the accident she was ambulatory; after the accident she was bedridden. Upon release from the hospital she required a wheelchair, walker, and cane. It took her two years or more before she could move around adequately. She suffered facial scarring as a result of lacerations to the face. We find no abuse of the trial judge’s vast discretion in awarding $350,000 for pain and suffering. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260-1261 (La.1993).
Accordingly, for the reasons stated the judgment is amended to reduce the award for medical expenses from $64,000 to $39,-125.34. The judgment is affirmed in all other respects.
AMENDED, AND AS AMENDED, AFFIRMED.

. She is also referred to as “Linda Latham" in the record.