688 So.2d 57 (1997)
Wanda GORDON, individually and on behalf of the minor child, Arzelia Gordon
v.
Joann M. LEVET.
No. 96-CA-600.
Court of Appeal of Louisiana, Fifth Circuit.
January 15, 1997.
Writ Denied April 4, 1997.
*59 Richard P. Ieyoub, Attorney General, William W. Hall, Special Assistant Attorney General, State of Louisiana, Department of Transportation & Development, Metairie, for Defendant/Appellant Department of Transportation & Development.
Lewis O. Unglesby, Unglesby & Koch, Baton Rouge, Walter Dumas, Walter C. Dumas & Associates, Baton Rouge, Thomas J. Kliebert, Jr., Gramercy, for Plaintiffs/Appellees.
Before BOWES, GOTHARD and CANNELLA, JJ.
GOTHARD, Judge.
On the afternoon of August 12, 1992, Wanda Gordon and her 12 year old daughter Arzelia Gordon had been grocery shopping and were returning to their home in Paulina via Louisiana Highway 44, a two-lane two-way stretch of River Road alongside the levee. It was raining and Gordon was traveling at a low rate of speed, approximately 20 miles per hour, in her red Escort. At the same time, Joann[1] Levet was traveling on the same highway in the oncoming direction. Levet's blue van navigated a curve, hit a puddle of water and hydroplaned across the center line and head-on into the Gordon vehicle. Wanda Gordon and Joann Levet were rendered unconscious at the scene, regained conscious at the scene and were transported to the hospital. Arzelia, who was injured and had remained conscious during the entire accident, was also transported to the hospital by ambulance. All parties suffered serious injury.
Wanda and Arzelia Gordon sued Joann Levet and her insurer on September 4, 1992. Levet and her insurer settled and were dismissed on February 4, 1993. Shortly thereafter the Gordons added the Louisiana Department of Transportation and Development [hereinafter "DOTD"] as a defendant. Levet also filed suit against DOTD. The two suits were consolidated and tried in a two day bench trial.
On December 18, 1995 the trial court rendered judgment in favor of Wanda Gordon in amounts totaling $3,926,048.74, and in favor of Arzelia Gordon in the amount of $350,000.00, assigning 25% fault to Joann Levet and 75% fault to DOTD. The court also rendered judgment in favor of Joann Levet for $300,000.00 general damages and in favor of Larry Levet for $50,000.00 past and future medical expenses and assigned 25% fault to Joann Levet and 75% to DOTD. On March 1, 1995, the trial court amended the Levet medical award by increasing it to $60,994.25, the amount stipulated to by the parties. DOTD appeals.
On appeal DOTD raises the following assignments of error:
1. The trial court erred in its allocation of burden of proof;
2 & 3. The trial court erred in failing to allow 3 witnesses to testify and erred in refusing to accept DOTD's proffer;

*60 4. The damages awarded were excessive.

ASSIGNMENT OF ERROR ONE
The trial court erred in imposing the burden of proof on defendant DOTD to exonerate itself of fault.
The instant case is not one in which a plaintiff put on no proof and the trial court required the defense to prove freedom from fault. Rather plaintiffs here established the elements of their case through the evidence and testimony presented and discussed as follows.
Plaintiff's case in chief consisted of the testimony of Glenn Louque, James Clary, Wanda Gordon, Arzelia Gordon, Johnny Clayton, Arnold Oncale, State Trooper Charles Dupuy, and Larry and Joann Levet.
Plaintiff first introduced the testimony of Glenn Louque of Louque's Automotive and Wrecker Service. Louque testified that he is not related to or a friend of any of the individuals involved in this case. Louque was in his office in Hester, Louisiana, approximately two and a half miles from the accident, when he received a call for his towing and wrecker services. He testified that it had been raining heavily, specifically a "downpour" for two hours before the accident. Louque testified that he had lived in the area all of his life and that he was very familiar with the accident site. He testified that there was a ramp[2] over the levee to a sand pit on the batture side of the levee. The ramp intersected River Road and was perpendicular to it. Dump trucks would traverse the ramp, dropping the crown of the sand load upon the ramp. When it rained, the sand would be washed down the ramp such that a puddle would routinely form on River Road at the base of the ramp. Louque testified that as he approached the accident scene on the day in question, he saw a large puddle of standing water, covering almost the entire lane and extending almost to the center line of the road. He stated that it was the largest puddle he had ever seen at that location, measuring twenty-five to thirty feet long, the complete width of the ramp. He said that River Road crowns at the center line such that water would flow from the center crown to the levee side of the lane where it would be trapped between the crown and the levee. He further testified that water, fine silt and sand mixed on the highway. Louque stated that when he arrived on the scene, emergency personnel were putting people into the ambulance. The red car was jammed between two cyclone fences and was smashed into a telephone pole and the blue van was still on the highway. The red vehicle was 60-75 yards from the puddle.
Thus, Louque's testimony, which is by a disinterested person, established the existence of the ponded water on the road and the location of the accident on River Road, as well as the general weather conditions.
James R. Clary, a civil engineer who worked both in-house and as a consultant for and against DOTD, was qualified as plaintiffs' expert witness in civil engineering and accident reconstruction. Clary testified as to the phenomenon "hydroplaning". He stated that vehicles hydroplane when water is trapped between the wheel and the road surface and cannot be pushed aside by the surface of the tire to establish traction on the road. A vehicle can hydroplane in as little as one-quarter inch to three inches of trapped water. The direction in which the vehicle travels while hydroplaning is related to which wheels and how many wheels are hydroplaning at the same time. If all four wheels are in the water, then there is no traction and the vehicle will continue traveling in the same direction it was already going. If the two right hand tires are in the water, then the resistance is going to make the car go right.
Clary testified that although there is a ditch on the levee side of the road, the culvert was almost completely covered in silt, such that only one-third of the pipe was useable. Because of the silted pipe, water builds up and runs across the road to the Lutcher side of the road, where there is no drainage ditch. He noted that the shoulders on the Lutcher side have heaved and are a little higher. Clary stated the puddle is being *61 fed by water from the road, the levee and the blocked ditch. The difference in elevation from the edge of the road to the centerline is three plus inches to four plus inches on the ponding side of the road. Clary testified that he observed the ponding effect on the morning he examined the road and found similar conditions on his other two visits.[3] Clary testified that the condition of standing water in the instant case is a condition that could be easily anticipated and avoided. He stated that the problem with the road was no ditch maintenance, little to no shoulder maintenance and that the shoulder needed to be bladed down.
Clary then reviewed the Louisiana DOTD Maintenance Planning Manual, which serves as DOTD's highway maintenance guidelines. The section enumerated Maintenance Function No. 442 discusses "Non-paved Shoulder Maintenance Guidelines". Guideline M4.6 "Heaved or High Shoulders" notes when threshold levels reach three inches, they prevent surface water from draining properly. Clary noted the threshold levels in the instant case are three plus inches. Clary further stated that water on the Lutcher side is moving at a faster rate of speed than water on the Convent side and that water moving at two different speeds leads to ponding and accumulation. Guideline M5.9 refers to the accumulation of foreign materials and vegetation in ditches as a maintenance item. Clary testified he saw vegetation and foreign matter clogging the drainage ditch at the accident site. Clary concluded DOTD has not followed its own maintenance planning manual. Clary also noted the DOTD Maintenance Planning Manual requires inspection once a week, but generally DOTD only inspects once every two weeks. Clary noted the conditions at the accident site had not been fixed on any of his three visits, which were several years apart.
Clary discussed the DOTD Work Orders for the accident site area for the period 1990 through 1993. During that period there was no maintenance other than tree removal or herbicidal application. Clary noted that under the Maintenance Planning Manual, DOTD is required to clean and repair drainage structures four times per year, but according to the work orders, it has not been doing so.
Clary studied the percentage of slope of the road in the area at issue. He took three cross-sections of the road. Highways are normally designed for a 2.5% slope, but in the highway at issue, cross-section A has 2.95% slope, cross-section B has a 3.13% slope and cross-section C has a 3.4% slope. He testified that when slope is greater than normal, the water drains more rapidly to the side of the road which means that it traps quicker.
Lastly, Clary testified that the highway department is responsible for maintenance from the highway right of way line to the opposite right of way line, including surface, shoulders, ditches, ditch fore-slopes, back slopes and up to one foot past the back slope of the ditch.
Thus Clary's testimony established causation, custody and control, and deviation from a standard of care, which deviation was a substantial cause of the accident.
Wanda and Arzelia Gordon and Joann Levet testified as to the location of the accident and the fact that it was raining.
Plaintiff called Arnold Oncale, the Parish Maintenance Supervisor for East St. James for DOTD. Oncale testified that he inspected the accident area approximately seven times in eight months. When he inspected the area, there was no heavy rain, so the roads were always dry. He had no complaints from anyone about the road area in question. Most importantly, Oncale testified his mowing crews did not do any grass cutting or ditch maintenance on the levee side of Highway 44 because he thought the Levee Board maintained the ditches on that side.
Oncale's testimony established DOTD's deviation from the standard of care. In fact when the defense called W.T. Taylor, Jr., District Administrator for District 61 for DOTD, he testified that he was distressed to hear "his people" testify that they believed they were not responsible for levee property. Taylor echoed Clary's earlier statement *62 when Taylor testified DOTD was responsible for maintenance from the right of way to the right of way, including the levee side of the road.
State Trooper Charles R. Dupuy testified that he arrived at the scene forty-five minutes to one hour after the accident. All of the passengers of the vehicles had already been taken to the hospital. There was a light drizzle as he was driving to the scene, which may or may not have stopped when he arrived at the scene. He further testified that the Levet vehicle was traveling south and the Gordon vehicle was traveling north, but he had switched it in his report. Trooper Dupuy's admission of this error is significant in that it raises questions about the accuracy of the mileage distance listed in the report and so heavily relied on by defendant.
It is apparent from the testimony discussed above that the plaintiff proved that the highway was under the care, custody and control of DOTD, that a substantial cause-in-fact of the accident was ponding water on the road caused by blocked drainage and silted drains due to lack of ditch maintenance, and that DOTD was responsible for maintaining the area and failed to comply with its own requirements under the Maintenance Planning Manual. Plaintiff carried their burden of proof. The trial court did not allocate an improper burden of proof to defendants, as plaintiffs proved their entire case separately and distinctly from any of defendant's evidence. At this point defendant could go forward and attempt to defend, but the trial judge clearly did not improperly allocate the burden of proof and plaintiffs did clearly establish the elements of their cause of action. Appellant's first assignment of error is without merit.

ASSIGNMENTS OF ERROR TWO & THREE
The trial court erred in refusing to accept DOTD's proffer under Code of Civil Procedure Art. 1636 and in refusing to allow three witnesses to testify.
DOTD's defense partially consisted of [1] proving that it was not raining hard enough to cause ponding by introducing records of the National Weather Service indicating there was little to no rain recorded at the Gramercy Station for that day and [2] proving that the accident did not happen on the part of River Road where the ponding water and ramp were located, but that it happened 500 yards further down the road.
Joseph Blaschke was qualified as DOTD's highway design, traffic engineering and accident reconstruction expert. Blaschke testified that as soon as he became involved with the case he realized that there was some confusion about locations of vehicles, directions of vehicles and the location of the site on the police report. At Blaschke's request, during the week before trial, Trooper Dupuy reinvestigated the accident. Trooper Dupuy, using the mileage indicated instead of the municipal address indicated thereon, concluded that the accident had actually occurred 500 yards further down River Road than the location indicated by the tow truck driver and the victims. He partially based this conclusion on the fact that the individual at the municipal address listed on the police report did not remember the accident, whereas individuals in houses down the block did remember an accident. DOTD wished to introduce the testimony of these "new witnesses" at trial, although they were not listed in the pre-trial order. DOTD sought to amend or supplement the pretrial order to allow these individuals to testify on the grounds that their testimony was "newly discovered evidence".
The standard to be applied by appellate courts in reviewing a trial judge's decision on amendment of a pre-trial order was enunciated in Zanca v. Exhibition Contractors Co., 614 So.2d 325, 329 (La.App. 4 Cir.1993):
The matter of whether to modify the pre-trial order is solely within the discretion of the trier of fact. Absent an abuse of discretion, the decision of the trier of fact will be upheld.
Code of Civil Procedure Article 1551 provides that the pre-trial order limits the issues for trial and controls the subsequent course of the action unless modified at trial to prevent manifest injustice. The trial judge correctly concluded that the discrepancy in the mileage figure in the police report had been available throughout the litigation and that *63 with due diligence, DOTD could have obtained this information at any time. The court concluded that DOTD had not been timely in pursuing this evidence, hence it was not "new evidence" and DOTD failed to meet the "manifest injustice" test. Accordingly, the trial judge correctly refused to change the pre-trial order. We cannot conclude that he abused his discretion.
Counsel sought to proffer the testimony or introduce statements, which the trial court likewise refused. On appeal DOTD argues that the trial court erred. Code of Civil Procedure Article 1636 provides:
A. When the court rules against the admissibility of any evidence, it shall either permit the party offering such evidence to make a complete record thereof, or permit the party to make a statement setting forth the nature of the evidence.
The language of article 1636 is mandatory, and the trial court was in error in refusing to accept the proffer of the excluded testimony. Anderson v. Casualty Reciprocal Exchange, 602 So.2d 282 (La.App. 2 Cir.1992).
In reviewing error on appeal, a reversal is not warranted unless the party alleging error shows that the error, when compared to the record in its totality, had a substantial effect on the outcome of case. Gongora v. Snay, 626 So.2d 759 (La.App. 5 Cir.1993), writ denied, 93-2912 (La.1/28/94), 630 So.2d 795. Accordingly, we review the effect of the trial judge's refusal to allow counsel to proffer the excluded testimony.
The purpose of a proffer was discussed in McLean v. Hunter, 495 So.2d 1298, 1305 (La.1986):
The very purpose of requiring a proffer is to preserve excluded testimony so that the testimony (whatever its nature) is available for appellate review. Without a proffer, appellate courts have no way of ascertaining the nature of the excluded testimony.
In the instant case, we have already concluded that the trial judge did not abuse his discretion in refusing to allow amendment of the pre-trial order, and in excluding the testimony at issue on the basis that the witnesses were not named in that order. Thus, even if the trial court had allowed the proffer, we would not have considered the testimony in this appeal. Therefore, the trial judge's refusal to allow the proffer, under the circumstances of this case, is harmless error.

ASSIGNMENT OF ERROR FOUR
The damages awarded were excessive.
The trial court awarded Wanda Gordon the following itemized damages:

Past Medical Expenses $ 93,474.74
Future Medical Expenses 633,589.00
Past Lost Wages 28,288.00
Future Lost Wages and/or
Earning Capacity 170,697.00
Permanent Disability and
Loss of Enjoyment of Life 1,500,000.00
Past and Future Physical Pain
and Suffering 1,500,000.00
 ____________
 3,926,048.74

For an award of general damages, under Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993) the initial test, prior to reviewing any other damage awards for purposes of a scale of reference, is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much", even "vast", discretion of the trier of fact.
Wanda Gordon suffered numerous debilitating injuries as a result of this accident. Her initial injuries consisted of a dislocated left hip, a fractured hip socket, a shattered right heel, a fractured left ankle and paralysis of the left foot, a large cut to the forehead, bruised right breast and blood in her urine.
Dr. Caesar Roca, Wanda Gordon's treating physician testified she has had twelve surgeries including six hip surgeries: two hip replacements, one open and one closed reductions, one total hip arthroplasty reconstruction and a left hip cup revision. He said hip surgery involves long post-operative recovery periods in traction. The left hip acetabular cup and the left head of the femur bone were described as "cornflakes" and completely shattered. Various surgical interventions and prosthetic devices were tried, but her hip dislocates easily. On one occasion her hip dislocated while she was in the hospital in traction recuperating from hip surgery. Her hip can dislocate due to a sneeze. Her hip replacement is not expected *64 to last for 10 years and Dr. Roca estimates that she will need at least two more replacement surgeries in the future. Alternatively, however, the hip is continuing to deteriorate, such that it may not be possible to do the needed future replacement surgeries and he may be required to remove all prosthetic devices and she will be permanently wheelchair bound. Due to the deteriorating hip, she will have increased general pain to the left hip, groin and thigh.
Wanda Gordon has other problems with the left side. Her left foot was severely injured when the sciatic nerve to the left foot was so severely damaged that it resulted in paralysis. Gordon wears a foot brace and will do so for the rest of her life. Both physical therapy and a surgical tendon transfer have been unsuccessful.
In addition to the left hip and foot, Gordon's left ankle fractured. Gordon underwent open reduction internal fixation surgery in which some of the bone is scraped down and metal ankle screws are inserted to secure the bones. The ankle began to degenerate and eventually degenerated to the extent that Gordon underwent a second surgery for the removal of the screws. Because the ankle was completely gone, Dr. Roca fused the ankle. She has chronic pain in the left ankle.
Moving to the right side, Gordon's right heel was shattered beyond recognition. Dr. Roca stated that it would be "literally like trying to reconstruct a broken eggshell". There is no way to repair the heel, which is entirely gone. Whenever she steps on her heel she experiences pain. All that can be done is provide a pressure sparing device to help alleviate some of the weight bearing pressure and pain. Minute parts of shattered bone still in Gordon's body work themselves into painful locations and must be removed. She is severely arthritic in this joint and he anticipates that the altered gait will cause degenerative arthritis to the right hip, knee and ankle.
Wanda Gordon was also admitted with a large cut to the forehead, bruised right breast and blood in her urine. Plaintiff's Exhibit 9 is a photograph of Wanda Gordon indicating a long facial scar that runs from the hairline into the right eyebrow.
Dr. Roca testified that all of Wanda Gordon's surgeries have been major and extremely painful surgeries. Because of the pain involved, Wanda Gordon now becomes extremely anxious and breaks out in hives at the mention of more hip problems. She has been treated by a dermatologist five times for this anxiety reaction. She has had twelve surgeries and Dr. Roca testified she will need four more surgeries, two hip replacements and one surgery to each foot.
Wanda Gordon can presently walk into Dr. Roca's office with the aid of a walker or two canes, but she cannot walk for any distance or period of time. She is permanently physically whole person disabled at 47% and is total lower extremity disabled 93%. She is facially disfigured. She is unable to take care of herself, her house or her child.
Rehabilitation Specialist Dr. Robert Voogt itemized some of plaintiff's limitations as unable to kneel or stoop, loss of desire for sexual intimacy, requires assistance in bathing and dressing, urinary incontinence, decreased ability to reach and carry things, easily fatigued, difficulty walking or moving, standing tolerance of fifteen minutes and decreased sitting tolerance, needs cane and/or walker for mobility, unable to twist or bend, altered sleep patterns, dependence, limited enjoyment of previously enjoyed activities, poor balance and changes in the sense of taste. Additionally, Wanda Gordon has suffered cognitive changes including memory impairment, difficulty reasoning, limited insight regarding her personality and cognitive changes and safety issues in that she is unable to be left alone in case of an emergency such as a fire. She has suffered personality and psychological changes including increased frustration and irritation as she attempts to resume former activity and a former way of life that is no longer possible, increased anxiety, anger, stubbornness, fussiness, and argumentativeness. Her personality changes also include a desire to be the center of attention, self-centeredness, low self-esteem and low self image due to her facial scarring and other disabilities, social isolation, and dependency. Lastly, her relationship *65 with her daughter has altered for the worse.
In light of the particular injuries suffered by Wanda Gordon and their effects upon Wanda Gordon and the particular circumstances of her life, we cannot conclude that under Youn, supra, the three million dollar award for general damages is a clear abuse of the "much", even "vast", discretion of the trier of fact. Accordingly, we affirm.
Turning to Wanda Gordon's special damages, DOTD argues the amount of future medical expenses is excessive. Plaintiff's economist was Dr. Melville Wolfson and DOTD's economist was Dr. Kenneth Boudreaux. Neither economist testified at trial, both submitted reports. DOTD states in its brief that Gordon's past medical expenses were $93,474.74, the same amount that plaintiff's expert totals as past medicals. Accordingly, there appears to be no disagreement on that amount.
DOTD argues that the trial judge erred in accepting Wolfson's future damage calculation in which he based his future medical amount on an average of Wanda Gordon's past medicals. In its brief, DOTD argues:
The DOTD's expert, Jennifer Palmer, applied a discount rate of 6.4% to Wanda's estimated future medical expenses and made two separate calculations based upon two different incremental increase rates. Assuming an incremental increase rate of 3%, Ms. Palmer estimated Wanda's future medical expenses to be $254,816.00. Assuming a 6% incremental increase rate, Wanda's future medicals would total $338,423.00. Ms. Palmer's report is Trial Exhibit Defendant 4.
Trial Exhibit Defendant 4 is a photograph of the road. D-5 is a report by DOTD's Vocational Rehabilitation expert, Thomas G. Mungall, III of the firm "Jennifer Palmer & Company A Professional Rehabilitation Corporation". D-6 is a report by DOTD's expert economist, "Kenneth J. Boudreaux, Ph. D., Consulting Economist". Nowhere in D-5, the Jennifer Palmer & Co. report, does its author state that he has applied an inflation rate or discount rate to anything. In fact, the figures provided are clearly present costs. DOTD economist Kenneth Boudreaux states in his report that "[t]he present value of the life care plan prepared by Thomas G. Mungall ranges from $254,816 to $338,423 when increased at 3.00% and 6.00% respectively, and discounted at 6.4%." DOTD's expert economist had an incorrect birth date for plaintiff, one that would have made her ten years older than she actually was at the time of the accident, hence all of his figures based on future life expectancy, such as future medical costs and future lost wages, are incorrect. The trial court had very little choice, but to go with Dr. Wolfson's award as that was the only competent evidence before him. Thus the trial court did not err in awarding $633,589.00 for future medicals.
DOTD did not brief or argue the issue of future lost wages, but the trial court judge used the figures provided by Wolfson, which were the only competent evidence before him.
DOTD argues that the $300,000.00 awarded to Arzelia Gordon were excessive. At the time of the accident, Arzelia Gordon was twelve years old. She suffered from asthma for which she took Ventolin and Ental inhalers. At the emergency room she was diagnosed with blunt abdominal trauma with splenic rupture. Her injuries from the accident included a ruptured spleen, a ruptured liver, a fractured right arm and a fractured left ankle. Her spleen was surgically removed and her liver was surgically partially resectioned. As a result of the splenectomy, she will suffer "Overwhelming Post Splenectomy Sepsis or Post Splenectomy Infection". Arzelia's surgeon, Dr. Charles J. McGaff, stated in his report, "It is a well known problem in the medical literature that young children who undergo Splenectomy are at an increased risk during their lifetime of developing certain types of infection ... The spleen provides a certain amount of protection to a group of bacteria and if the spleen has been removed during childhood these bacteria have a marked propensity to cause an overwhelming infection later in the life." In addition to her physical injuries, Arzelia has a loss of consortium claim. Because of her debilitating physical injuries, Wanda Gordon can no longer physically take *66 care of Arzelia. Because of her decreased mobility, Wanda Gordon no longer accompanies her daughter on trips or to activities at her school. Because of Wanda Gordon's personality changes resulting from the accident, the maternal-child relationship between Wanda and Arzelia has deteriorated.
In light of the precepts of Youn, supra, we cannot conclude that the three hundred thousand dollar award for general damages is a clear abuse of the "much", even "vast", discretion of the trier of fact, in light of the particular injuries suffered by Arzelia Gordon and their effects upon her and the particular circumstances of her life, especially as it relates to her loss of consortium claim.
DOTD also argues that the trial court abused its discretion in the amount of damages awarded to Joann Levet. Joann Levet was admitted to the emergency room at River Parishes Hospital with complaints of pain in both shoulders, head, right knee and leg. Her neck and spine were immobilized. She was diagnosed with a right humerus fracture, a left scapular fracture, a left third rib fracture, a right tibial plateau fracture, a right fibular head avulsion fracture, and a jagged cut to the left forehead and scalp which required sixty stitches. She had a broken neck, a crushed right leg that required a plate, a crushed right arm that required a pin, a cut ankle and a fractured rib. She underwent surgery for a humerus fixation and a right rotator cuff repair. She was hospitalized from August 14th to August 26th. She was initially told that she would never walk again. She was in bed for two months, then she used a wheelchair. She was told to wear a knee immobilizer and knee therapy was established. At home she used an electric hospital bed, a reclining chair with elevating legs and removable arms, and a trapeze. She underwent a serious regime of physical therapy and by October was able to start using a walker. Dr. Roca testified that for a person with her injuries, the only way that she could achieve the rehabilitative success that she has achieved is by pushing herself beyond her limits. On February 18, 1993 she was discharged to return to work. Dr. Roca testified that in the future she will have arthritis in the right knee and will possibly need knee replacement surgery. During the period of her incapacitation, Levet was unable to care for her house, children or husband and was unable to work. She continues to have metal plates and pins. We cannot conclude that the trial judge abused his discretion in the amount of damages awarded.
Lastly, DOTD in its reply brief asks this court to make a statement reserving its rights to a constitutional argument it plans to make to the Supreme Court. Because that issue was not raised as an assignment of error or listed in the motion for appeal and was raised for the first time in a reply brief, it is not properly before us. Even if it were properly before us, this court has already ruled in Begnaud v. Department of Transportation, 95-714 (La.App. 5 Cir. 2/14/96), 679 So.2d 113, writ denied 96-1244 (La.6/21/96), 675 So.2d 1087, that the constitutional amendment to LSA-Const. Art. 12 Section 10(C) was not retroactive.
For the reasons discussed, the judgment of the district court is affirmed.
AFFIRMED.
CANNELLA, J., concurs in part and dissents in part.
CANNELLA, Judge, concurring in part and dissenting in part.
I agree with the majority on the issue of liability and the percentages of fault of the parties. However, I disagree with the majority decision on the damage awards. I find the damage awards excessive, evidencing a clear abuse of discretion. In my view, the awards to Wanda Gordon, Arzelia Gordon and Joann Levet should each be reduced by one half.
NOTES
[1] Spelled both "Joann" and "JoAnn" in the record.
[2] The witnesses refer to a "ramp". It is a dirt, asphalt, shell and gravel road over the levee.
[3] On the morning of the trial, the judge, parties, and experts all went to the accident location.