694 So.2d 650 (1997)
Robert J. MOREHEAD, et ux., Plaintiffs-Appellees,
v.
FORD MOTOR COMPANY, et al., Defendants-Appellants.
No. 29399-CA.
Court of Appeal of Louisiana, Second Circuit.
May 21, 1997.
Rehearing Denied June 12, 1997.
*653 Pulaski, Gieger & Laborde by Michael T. Pulaski, New Orleans, for Defendants-Appellants.
Ronald E. Raney, Shreveport, for La. Health Service, Blue Cross/Blue Shield.
Donald O. Collins, New Orleans, for Torrington Co.
Nelson, Hammons & Self by Sydney B. Nelson, Shreveport, William H. McDonald & Associates by William H. McDonald, Price, Fry & Robb by William R. Robb, Springfield, MO, for Plaintiffs-Appellees.
Before HIGHTOWER, STEWART and PEATROSS, JJ.
STEWART, Judge.
Ford Motor Company appeals a jury verdict in favor of Robert and Dorothy Morehead finding the Ford F-150 pickup truck unreasonably dangerous, apportioning 100% fault to Ford, and awarding $5,000,000 to Mr. Morehead and $1,000,000 to Mrs. Morehead which award was reduced to $350,000 by the trial court on Ford's motion for new trial. For the following reasons, we amend and, as amended, affirm.

FACTS
On July 24, 1992, Robert Morehead and his wife, Dorothy, were injured in a single-vehicle accident in Webster Parish, Louisiana. Mr. Morehead was driving a 1992 Ford F-150 pickup truck eastbound on Louisiana Highway 528 when he bent down to pick up a newspaper that had blown on the driver's side floor of the truck. As he did so, the truck drifted across the oncoming lane of traffic and traveled approximately two hundred feet on the grassy, gravel north shoulder of the highway. Mr. Morehead then steered the truck to the right veering back onto the road. After crossing both lanes of traffic, the truck left the roadway on the south side, spun counterclockwise and rolled over approximately forty-seven feet, leading with and landing on the passenger side.
The speed limit on Louisiana Highway 528 is fifty-five miles per hour. Mr. Morehead testified that he was driving approximately thirty-five miles per hour. Trooper C.D. Lee of the Louisiana State Police investigated the accident and testified that he had no reason to dispute Mr. Morehead's estimation of his speed. Mrs. Morehead testified that the speed of the vehicle was approximately thirty to thirty-five miles per hour. Simon Tamny, the Moreheads' reconstruction expert, testified that he estimated the speed of the pickup to be approximately forty miles per hour as it traveled on the north shoulder of the highway, approximately thirty-six miles per hour when the truck left the road on the south side, and approximately twenty-two miles per hour when the vehicle began to roll over. Dr. Gary Thompson, whose deposition was introduced into evidence by Ford, estimated that the speed of the vehicle was 49.1 miles per hour as it began traveling on the north shoulder of the road and that the speed of the truck was 28.9 miles per hour when it started to roll over. Dr. John Lee Habberstad, *654 Ford's accident reconstruction expert, testified that, when the pickup left the highway on the north side, the speed of the vehicle was "Fifty-four, fifty-five, up to maybe sixty, we can't be totally precise, but traveling on the order of the speed limits out there."[1] Dr. Habberstad further testified that the speed of the truck was approximately forty-seven miles per hour when it reentered the roadway from the north side, approximately thirty-eight miles per hour when it left the highway on the south side, and approximately twenty-five miles per hour when it began to roll.
Both Mr. and Mrs. Morehead were injured in the accident. Mr. Morehead suffered life-threatening injuries resulting in paralysis from the chest down with limited arm use, no control over bladder or bowel movement, and confinement to bed or wheelchair. Mrs. Morehead sustained broken ribs and multiple lacerations.
After purchasing the pickup on July 7, 1992, and prior to the accident, the Moreheads had taken the truck back to Champion Ford to have sealant put on the paint and to add a liner and running boards. They testified that each time they drove over a bump in the road near the dealership they heard a noise which sounded like gravel striking the undercarriage. They did not hear the noise at any other time and did not have it checked by the dealer.
After the accident, both parties inspected the truck and found that the intermediate steering shaft, which is composed of two tubes, one of which fits inside the other, had pulled apart at the joint between the two tubes. The overlap at the joint is eleven-sixteenths of an inch.
Mr. and Mrs. Morehead filed suit against Ford and the dealership, Champion Ford, on July 6, 1993. On January 30, 1995, The Torrington Company, manufacturer of the steering shaft, was added as a defendant. Prior to trial, the court granted Torrington's motion for summary judgment and dismissal. The trial court rendered a directed verdict dismissing the Moreheads' claims against Champion with prejudice.
Following the jury verdict in favor of Mr. and Mrs. Morehead, Ford filed timely a motion for JNOV which was denied by the trial court. Mrs. Morehead consented to remittitur to $350,000 on Ford's motion for new trial. The trial court did not disturb the verdict in favor of Mr. Morehead.
Ford now appeals and assigns five errors:
I. The trial court erroneously denied Ford's motion for JNOV.
II. The trial court abused its discretion in denying Ford's motion for new trial.
III. The trial court abused its discretion by refusing to limit or exclude the testimony of Simon Tamny, or give an adverse inference instruction, due to his spoliation of evidence.
IV. The trial court abused its discretion by refusing to grant Ford relief for the prejudice created by Simon Tamny's new and undisclosed testimony at trial.
V. The jury's verdict was clearly wrong and manifestly erroneous because it failed to apportion fault to R.J. Morehead, failed to recognize that the Moreheads had not presented sufficient proof to meet their burden of proof or to support Simon Tamny's opinions, and awarded excessive damages not supported by the record.

DISCUSSION

Assignments of Error I and II
In its first and second assignments of error, Ford contends that the jury verdict was unsupported by sufficient evidence and that the trial court improperly denied its motions for JNOV and new trial.
La.C.C.P. art. 1811 governs judgments notwithstanding the verdict but fails to establish grounds upon which the trial court may grant a motion for JNOV. However, standards have developed jurisprudentially. JNOV is a question of whether the jury verdict, as a matter of law, is supported by any legitimate or substantial evidence. To determine that the evidence was insufficient as a matter of law requires a finding that no valid line of reasoning and permissible inferences *655 could possibly lead rational persons to the conclusion reached by the jury. Because such a finding leads to a directed verdict terminating the action without resubmission to another jury, this standard is harsh. When applying this test, the trial court may not substitute its judgment of the facts for that of the jury and must consider all evidence in the light most favorable to the prevailing party and giving that party the benefit of every legitimate and reasonable inference that could have been drawn from the evidence. Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986); Laing v. American Honda Motor Co., Inc., 628 So.2d 196 (La.App. 2 Cir.1993); Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La. App. 2 Cir.1991); Willis v. Louisiana Power & Light Company, 524 So.2d 42 (La.App. 2 Cir.1988), writ denied 525 So.2d 1059 (La. 1988). A JNOV is warranted only when the facts and inferences, viewed in the light most favorable to the party opposing the motion, is so strongly and overwhelmingly in favor of the moving party that reasonable men could not reach a different conclusion, not merely when there is a preponderance of evidence for the mover. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La. 1991); Parker v. Centenary Heritage Manor Nursing Home, 28,401 (La.App. 2 Cir. 6/26/96), 677 So.2d 568; May v. Jones, 28,106 (La.App. 2 Cir. 5/8/96), 675 So.2d 275; Jackson v. A.L. & W. Moore Trucking, 609 So.2d 1064 (La.App. 2 Cir.1992); Gibson v. Bossier City General Hospital, supra; Brantley v. General Motors Corp., 573 So.2d 1288 (La. App. 2 Cir.1991), writ denied 577 So.2d 17 (La.1991). The trial court does not have the discretion to weigh the evidence, evaluate the credibility of witnesses, or substitute its judgment for that of the jury. Anderson v. New Orleans Public Service, Inc., supra; May v. Jones, supra; Gibson v. Bossier City General Hospital, supra. In reviewing a decision of the trial court, the appellate court must determine whether the trial court committed manifest error or was clearly wrong in denying the motion. Laing v. American Honda Motor Co., Inc., supra; Gibson v. Bossier City General Hospital, supra.
La.C.C.P. art. 1972 provides that the trial court shall grant a motion for new trial when the verdict appears clearly contrary to the law and evidence. La.C.C.P. art. 1973 provides discretion for the trial court to grant a motion for new trial if good grounds exist. Unlike the JNOV, the trial court may evaluate the evidence without favoring any party, draw his own inferences and conclusions, and assess the credibility of witnesses when determining whether to grant a motion for new trial. May v. Jones, supra; Gibson v. Bossier City General Hospital, supra. The trial court's discretion is great and will not be disturbed on appeal absent an abuse of that discretion. May v. Jones, supra; Gibson v. Bossier City General Hospital, supra.
Mr. Morehead testified that, as he bent down to retrieve a piece of paper under his feet, the two left tires of the truck left the road and traveled on the north shoulder. He stated that he then steered right approximately thirty-five degrees to reenter the roadway, crossed the center line and attempted to steer left to proceed in the eastbound lane. Yet, when Mr. Morehead turned the steering wheel to the left, he testified that the truck did not respond. Mrs. Morehead testified that the direction of the pickup never changed once Mr. Morehead steered back onto the highway from the north shoulder. She further testified that Mr. Morehead indicated that the steering on the vehicle did not respond.
Referring to the photographic evidence, Mr. Tamny testified that the tire tracks indicated that Mr. Morehead steered right from the north shoulder of the road and that the wheels straightened without any steering due to the design of the vehicle. Additionally, Mr. Tamny testified that the tire marks do not show any steering to the left after the tires straightened. He stated that the photographs are consistent with Mr. Morehead's testimony that the steering mechanism did not respond. Further, Mr. Tamny testified that the tracks of the tires on the north shoulder of the highway indicate that the truck was not out of control when it left the road on the north side.
After the accident, an examination of the vehicle revealed that the intermediate steering *656 shaft had separated. Mr. Tamny opined that the steering shaft separated as Mr. Morehead steered to the right from the north shoulder of the road.
Martin Riccitelli[2], employed as a product development engineer with Torrington Company, manufacturer of the intermediate steering shaft, stated that the photographs taken of the steering shaft after the accident show that the shaft separated at the collapse joint where the outer tube and the inner tube, also called the midtube, should have been connected. He testified that the steering mechanism would be inoperable if the two tubes were completely separated.
Tom DeSantis, a design analysis engineer employed by Ford, testified that Ford did not conduct any tests of the new 1992 design of the intermediate steering shaft to determine whether the shaft would pull apart and that he had requested that data from Torrington Company but did not receive any information from them. He further testified that the pickup truck would have no steering if the steering shaft separated.
Although Ford's experts believed that the rollover caused the intermediate steering shaft to pull apart, Mr. Tamny testified that the intermediate steering shaft separated when Mr. Morehead steered right onto the road from the north shoulder. The jury could have reasonably concluded that photographic evidence corroborated Mr. Morehead's testimony and supported Mr. Tamny's opinion based on that evidence. The testimony of Mr. Riccitelli and Mr. DeSantis established that the intermediate steering shaft on the 1992 Ford truck was a new design and that Ford had not independently tested the new design before installing it in the 1992 Ford F-150 trucks.
We cannot say that the trial judge was clearly wrong in denying Ford's motions for JNOV and new trial. Therefore, these assignments are without merit.

Assignments of Error III and IV
Ford, in its third and fourth assignments of error, asserts that the trial court abused its discretion by failing to limit or exclude the testimony of Simon Tamny, or give an adverse inference instruction, due to Mr. Tamny's improper disposal of evidence and by refusing to grant Ford relief for the prejudice created by Mr. Tamny's new and undisclosed testimony at trial.
Where a party fails to produce evidence available to him, the presumption is that the evidence would have been unfavorable to him. Williams v. General Motors Corp., 93-0287 (La.App. 4 Cir. 2/11/94), 639 So.2d 275, writs denied, 94-1896, 94-1898 (La.11/11/94), 644 So.2d 387, 388. However, the presumption of spoliation of evidence does not apply when a reasonable explanation exists for the failure to produce the evidence. Randolph v. General Motors Corp., 93-1983 (La.App. 1 Cir. 11/10/94), 646 So.2d 1019; Bourgeois v. Bill Watson's Investments, Inc., 458 So.2d 167 (La.App. 5 Cir.1984); Babineaux v. Black, 396 So.2d 584 (La.App. 3 Cir.1981).
The Moreheads did not have the intermediate steering shaft in their possession at any time before the trial. Mr. Tamny had the steering shaft removed from the vehicle and shipped to his office in Ohio after Ford's experts had an opportunity to examine the allegedly defective part on three occasions before removal from the truck and prior to Mr. Tamny's inadvertent discarding of the steering shaft. Mr. Tamny testified that he disposed of the steering shaft prior to trial because he had been told that the case had settled.
Ford filed two motions in limine. The ruling on these two motions is not a part of the record. The first sought to preclude Mr. Tamny from mentioning settlement negotiations as a reason for his disposal of the intermediate steering shaft. The second requested that the trial court exclude or limit Mr. Tamny's testimony due to spoliation of the evidence. Apparently, the trial court essentially granted the first motion directing that the issue of spoliation not be raised and, if raised, Mr. Tamny was not to mention settlement negotiations. The issue of spoliation was discussed in opening by the Moreheads' counsel. At that time, counsel for *657 Ford considered the possibility of moving for mistrial, but Ford never made such a motion. However, Ford objected to Tamny's statements regarding any attempts to settle and received a limiting instruction to the jury on that issue. Ford did not object to the jury charge or request any instruction regarding destruction or spoliation of evidence.
The record does not support a finding that the evidence was in the Moreheads' custody nor that the evidence was discarded through any negligent or deliberate act on the part of the Moreheads. Mr. Tamny's explanation concerning his disposal of the evidence was adequate. His discarding the components of the intermediate steering shaft, while unwise, was not done with the intent to prejudice Ford. Additionally, the trial court's instruction to the jury regarding Mr. Tamny's statements about settlement eliminated any possible prejudice to Ford. Therefore, we do not find that the trial court abused its discretion by not limiting or excluding the testimony of Mr. Tamny and by not including an adverse presumption instruction in the charge to the jury.
Further, Ford asserts that they were prejudiced by changes in Mr. Tamny's testimony that were not disclosed until trial, specifically that they were "surprised" when Mr. Tamny was offered as an accident reconstruction expert, that Mr. Tamny's opinion regarding the failure of the steering shaft changed from his depositions to his testimony at trial, and that his testimony concerning the noise heard by the Moreheads two times when they drove over a bump near the Ford dealership was inconsistent.
Pretrial discovery is designed to prevent last minute, surprise evidence. Williams v. General Motors Corp., supra. In his first deposition on May 23, 1995, Mr. Tamny indicated that Dr. Gary Thompson was handling the accident reconstruction. However, on July 5, 1995, the Moreheads' attorneys presented counsel for Ford a package of materials, including a "single vehicle simulation test" conducted by Mr. Tamny. Mr. Tamny was deposed for a second time on November 7, 1995. At that deposition, Ford's attorney questioned Mr. Tamny extensively regarding the simulation test. Trial of this matter did not begin until March 19, 1996. Ford objected to Mr. Tamny's offer as an expert in the field of automotive engineering but did not object to his offer as an expert in the fields of mechanical engineering, accident reconstruction and product design.
When first deposed, Mr. Tamny testified that the steering shaft may possibly have failed and been reassembled before the Moreheads purchased the pickup in July, 1992. In his second deposition, Mr. Tamny stated that the intermediate steering shaft was pulled apart and reassembled before installation in the vehicle. However, at trial Mr. Tamny opined that the steering shaft had not been completely pulled apart before installation.
Although his testimony appears to be inconsistent, Mr. Tamny clarified what he meant when he said "pulled apart" during his testimony at trial. Mr. Tamny explained that the steering shaft is effectively "pulled apart" and the strength of the joint destroyed when the inner tube, or midtube, is pulled approximately one-half inch. At that point, the two tubes overlap slightly and are still connected.
Further, Mr. Tamny testified during depositions that he could not interpret the noise heard by the Moreheads. At trial, Mr. Tamny opined that the noise was caused by the inner tube extending fully and hitting the end of the intermediate shaft. When asked why his testimony had changed, Mr. Tamny explained that, through his examination and testing of the shaft, he had eliminated all other sources for the noise.
The record indicates that Ford was aware that Mr. Tamny was conducting accident reconstruction tests prior to his second deposition. Consequently, we do not find that Ford was surprised by Mr. Tamny's offer as an accident reconstruction expert. Although Mr. Tamny's testimony appears to be inconsistent, a review of Mr. Tamny's rather lengthy examination at trial establishes that Ford had the opportunity to cross-exam Mr. Tamny regarding his testimony at trial which differed from his testimony during the two pretrial depositions and was not prejudiced *658 by such change in his testimony. Further, we do not find that Ford was prejudiced by any new and undisclosed testimony. Therefore, these assignments are without merit.

Assignment of Error V
In its final assignment of error, Ford contends that the verdict was clearly wrong because the jury failed to assess any fault to Mr. Morehead, failed to recognize that the Moreheads had not met their burden of proof under the Louisiana Products Liability Act and had not provided adequate factual support for Mr. Tamny's opinions, and awarded excessive damages.
The Moreheads cite Rue v. State Department of Highways, 372 So.2d 1197 (La.1979), in support of their position that Mr. Morehead's actions which caused the truck to veer onto the shoulder of the road are not, by themselves, negligent. They argue that Mr. Morehead did not lose control of the truck when driving on the north shoulder of the highway and that the accident was due solely to the separation of the steering shaft as Mr. Morehead attempted to reenter the eastbound lane of traffic.
A jury's finding of fact may not be reversed absent manifest error or unless clearly wrong. The Louisiana Supreme Court annunciated a two-pronged test for setting aside the jury's determinations. The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the jury and, then, must determine that the record establishes the finding is clearly wrong. Stobart v. State through DOTD, 617 So.2d 880 (La.1993); Mart v. Hill, 505 So.2d 1120 (La.1987); Parker v. Centenary Heritage Manor Nursing Home, supra. Where conflict exists in the testimony, reasonable evaluations of credibility and inferences of fact should not be disturbed on review, even when the appellate court may feel that its own evaluations and inferences are more reasonable that those of the jury. Blair v. Tynes, 621 So.2d 591 (La.1993); Stobart v. State through DOTD, supra; Rosell v. ESCO, 549 So.2d 840 (La. 1989); Parker v. Centenary Heritage Manor Nursing Home, supra.
In reviewing conflicting expert testimony, the jury has the responsibility to determine which evidence is most credible. Rosell v. ESCO, supra. Where two permissible views of evidence exist, the jury's choice between them cannot be clearly wrong or manifestly erroneous. Rosell v. ESCO, supra.
Mr. Tamny testified that the intermediate steering shaft separated when Mr. Morehead steered right to reenter the roadway from the north shoulder which separation resulted in a loss of steering. Mr. Tamny testified that a defect in the intermediate steering shaft caused the Moreheads' accident. Ford's experts, Mr. DeSantis and Dr. Habberstad, opined that the intermediate steering shaft was not defective and did not separate until the truck rolled over. They further testified that a defect in the intermediate steering shaft could not have caused the accident. Apparently, the jury believed Mr. Tamny.
Additionally, although he stated that he leaned over to retrieve a piece of paper from the floorboard, Mr. Morehead testified that he did not lose control of the vehicle when it strayed onto the north shoulder of the road. The photographs taken at the scene of the accident support Mr. Morehead's testimony. Further, Mr. Morehead testified that the steering mechanism was inoperable when he attempted to steer left and into the eastbound lane of travel after driving back onto the highway from the north shoulder. Mrs. Morehead corroborated her husband's testimony and testified that Mr. Morehead's statements and actions indicated that the pickup truck had no steering.
Reviewing the contrasting testimony of the experts and witnesses, we cannot say that the jury's assessment of fault was manifestly erroneous or clearly wrong.
Ford also argues that the Morehead's failed to meet their burden of proof pursuant to the Louisiana Product Liability Act. A product is unreasonably dangerous in construction or composition, if at the time the product left the control of the manufacturer, the product deviated in material way from the specifications or standards for the product *659 or if the product deviated from otherwise identical products made by the same manufacturer. La.R.S. 9:2800.55; Ashley v. General Motors Corp., 27,851 (La.App. 2 Cir. 1/24/96), 666 So.2d 1320. A product is unreasonably dangerous in design, if at the time the product left the control of the manufacturer, an alternative design that would have prevented injury to the claimant existed, provided that the burden of the alternative design and the adverse effect on the products utility is outweighed by the probability and severity of the damage. La.R.S. 9:2800.56; Ashley v. General Motors Corp., supra. Plaintiffs must establish that the damages were proximately caused by a characteristic of the product which rendered it unreasonably dangerous. La.R.S. 9:2800.54.
In their petition, the Moreheads stated claims pursuant to both the manufacturing defect and design defect provisions of the Louisiana Products Liability Act which became effective in 1988. The jury answered interrogatories regarding both theories affirmatively. However, Ford addresses only the jury's finding under the design defect provision.
Mr. Morehead stated that the steering mechanism on the pickup failed to respond when he attempted to steer left and into the eastbound lane of travel. Trooper Lee testified as to the tracks and marks left by the tires of the Morehead vehicle on the road and its shoulders. The jury could have reasonably concluded that the photographs taken of the tire marks on the north shoulder of the highway, across the roadway, and into the ditch on the south side of the road establish that the wheels of the vehicle were turned right, then straightened out, and followed a path which did not indicate any steering to the left. Mr. Tamny testified that the photographic evidence was consistent with Mr. Morehead's version of the incident. Dr. Habberstad also testified as to the importance of the photographic evidence. Both Mr. Tamny and Dr. Thompson testified that the photographs do not indicate any steering input after the wheels were turned right when Mr. Morehead reentered the roadway from the north shoulder.
Mr. Tamny testified that the marks on the left front wheel of the truck demonstrated that the tire struck the north pavement edge with substantial force. Mr. DeSantis admitted that Ford's inspection team noted the marks. Dr. Habberstad also acknowledged the marks.
Ample testimony and evidence provided factual support and a basis for Mr. Tamny's opinions. Ford had an opportunity at trial to cross-examine Mr. Tamny regarding his interpretation of the photographic evidence, the computer simulation and steering column tests he conducted, and his opinions on possible cab displacement, the speed of the truck and intermediate shaft separation during a rollover. The testimony and evidence adduced at trial substantiated Mr. Tamny's opinions that the intermediate steering shaft separated upon the truck's impact with the north edge of the pavement and that the impact caused the total separation of the collapse joint which rendered the steering mechanism inoperable and caused the accident and damages to the Moreheads. Further, Mr. Tamny testified that the overlap of the two tubes was insufficient to prevent the shaft from fully extending and beginning to separate. He stated that additional overlap would prevent the complete separation which occurred in the case sub judice and suggested that Ford should conduct a visual inspection of the part before installation. Mr. Tamny testified that the alternative design and additional inspection was within Ford's knowledge and capability and was economically feasible in that the cost to Ford would be less than five cents per vehicle. Ford did not introduce any evidence to the contrary. Although the testimony of Mr. DeSantis and Dr. Habberstad contradicts portions of Mr. Tamny's testimony, the determination of what weight and credibility to give each expert's testimony was well within the discretion of the jury.
While the evidence is not overwhelming, Mr. Tamny presented sufficient evidence for a reasonable juror to conclude that a design defect existed in the Ford F-150 pickup and that the defect caused the Moreheads injuries. This case is distinguishable from Lawrence v. General Motors, 73 F.3d 587 (5th *660 Cir.1996), wherein the court held that plaintiffs failed to meet their burden under the Louisiana Product Liability Act because the only evidence of an alternative design was plaintiffs' expert's suggestion of a longer sleeve. The court stated that scant evidence showed that the risk that the sleeve as used would cause plaintiff's damage and severity of that damage outweighed the burden on the manufacturer to adopt a longer sleeve and the adverse effect of a longer sleeve on the utility of the product. However, in the instant case, Mr. Tamny testified that a defect resulted in the separation of the intermediate steering shaft which separation caused the Moreheads' damage and that a longer overlap of the two tubes would have prevented this accident from occurring. His testimony also established that the burden on Ford of adopting a longer overlap was minimal.
We do not find that the jury was clearly wrong in determining that the Moreheads had sufficiently proven a claim pursuant to the Louisiana Products Liability Act and that sufficient facts supported Mr. Tamny's opinions.
Ford also contends that the damages awarded were excessive for both Mr. Morehead and Mrs. Morehead. Ford asserts that the award to Mr. Morehead of $5,000,000 is excessive in light of the circumstances of this case. Ford argues that the life care plan introduced by the Moreheads is speculative considering that the evidence established that Mrs. Morehead is Mr. Morehead's primary caretaker. Ford cites a number of cases involving similar injuries where the damage awards were substantially less than the award in this case.
Additionally, Ford asserts that, although the trial court reduced the award to Mrs. Morehead to $350,000, the award is still excessive since the award is primarily for loss of consortium considering Mrs. Morehead's medical damages totaled only $5,605.47 and her lost wages were $74,000. Ford argues that Louisiana appellate courts do not favor high consortium awards and cites numerous cases in support of its position.
In response to Ford's assignment of error regarding the amount of damages, the Moreheads reiterate the special damages as proven at trial and contend that the general damages awarded Mr. Morehead were only $2,732,000. The Moreheads argue that the particular circumstances of this case warrant an award of that amount. Regarding the award to Mrs. Morehead, the Moreheads list the components of a loss of consortium claim as established by this court in Morris v. Owens-Illinois, Inc., 582 So.2d 1349 (La. App. 2 Cir.1991), and argue that Mrs. Morehead's loss far exceeds that of other loss of consortium claims.
An appellate court should rarely disturb an award of general damages due to the great, even vast, discretion vested in the trier of fact. In reviewing an award for general damages, the initial test, prior to considering any other damage awards for purposes of a point of reference, is whether the award for the particular injuries and their effects under particular circumstances on the particular injured person is a clear abuse of the vast discretion of the trier of fact. Gordon v. Levet, 96-600 (La.App. 5 Cir. 1/15/97), 688 So.2d 57; Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). In Gordon v. Levet, supra, the court of appeal affirmed the trial court's award of $926,048.74 in special damages and $3,000,000 in general damages to Wanda Gordon who suffered numerous debilitating injuries as a result of an automobile accident. Her initial injuries included a dislocated left hip, a fractured hip socket, a shattered right heel, a fractured left ankle and paralysis of the left foot, a large cut to the forehead, bruised right breast and blood in her urine. A number of those injuries required major and extremely painful surgeries. Ms. Gordon is 47% permanently physically whole person disabled at 47% and is 93% total lower extremity disabled. The court also affirmed the trial court's award of $300,000 to twelve-year-old Arzelia Gordon for her personal injuries and loss of consortium.
This court affirmed a general damage award of $3,000,000 to a young woman with double spastic hemiplegia and quadriplegia who regained partial use of her right hand and leg and partial control of her bladder *661 and bowels. Holt v. State Through DOTD, 28,183 (La.App. 2 Cir. 4/3/96), 671 So.2d 1164, writ granted, 96-1074 (La. 6/21/96), 675 So.2d 1093.
In Pitre v. Louisiana Tech University, 26,388 (La.App. 2 Cir. 5/10/95), 655 So.2d 659[3], this court concluded that a $2,500,000 general damage award would compensate plaintiff, a 20-year-old student left a paraplegic following a sledding accident, for his permanent disability, pain and suffering, mental anguish and loss of quality and enjoyment of life, past and future. This court additionally awarded $1,292,601.87 in special damages and $35,000 to each parent for their loss of consortium.
The court of appeal affirmed the trial court's award of $1,500,000 in general damages for past and future pain, suffering and mental anguish and increased the award for future medical care to $2,000,000 where plaintiff, a 20-year-old man injured in an automobile accident and rendered an incomplete paraplegic, would require attendant care of eight hours a day increasing to 16 hours a day in the future. Doucet v. Champagne, 94-1631 (La.App. 1 Cir. 4/7/95), 657 So.2d 92.
An award of $1,000,000 for physical pain and suffering, $1,000,000 for mental pain and suffering, $500,000 for permanent disability and $500,000 for disfigurement to warehouse worker who was rendered a paraplegic was not an abuse of discretion. Hopper v. Crown, 93-2021 (La.App. 1 Cir. 10/7/94), 646 So.2d 933.
As a result of the accident, Mr. Morehead suffered multiple facial lacerations, punctured lungs, fractured ribs and sternum, a "flail" chest, and multiple fractures of the dorsal spine with spinal cord injury causing paraplegia from the upper shoulders down. Mr. Morehead also suffered respiratory failure as a secondary condition. He remained in intensive care for forty-seven days and was unable to speak for approximately four months due to a tracheostomy tube. After release from intensive care, Mr. Morehead continued a drug regime including antidepressant, heart, lung, blood thinner, anxiety and sleep medications. When Mr. Morehead's condition stabilized, he underwent surgery on his spine.
Mr. Morehead is a sixty-six year old paraplegic with a life expectancy of 14.3 years. He has limited arm use due to the location of the paralysis. He has no control over his bladder or rectum and must be catheterized three or four times a day. His paralysis causes muscle spasms, tightness and jerking in his legs. He requires assistance turning over in bed to prevent decubitus ulcers. At trial Mr. Morehead presented evidence regarding cost of a future life care plan which would include 24 hour attendant care.
The jury awarded Mr. Morehead a lump sum of $5,000,000. The testimony and evidence adduced at trial indicate that Mr. Morehead's special damages totaled $2,268,538.96. Approximately $2,732,000 in general damages were awarded to Mr. Morehead. Considering the circumstances of this case and the gravity of the injuries to Mr. Morehead, we do not find that the jury abused its great discretion in the award to Mr. Morehead.
In deliberations concerning loss of consortium, the trier of fact is given great discretion. Mathews v. Dousay, 96-858 (La. App. 3 Cir. 1/15/97), 689 So.2d 503; Doucet v. Doug Ashy Bldg. Materials, Inc., 95-1159 (La.App. 3 Cir. 4/3/96), 671 So.2d 1148. Entitlement to loss of consortium damages is a question of fact which will not be reversed on appeal absent manifest error. Mathews v. Dousay, supra; Lonthier v. Northwest Ins. Co., 497 So.2d 774 (La.App. 3 Cir.1986).
In a claim for loss of consortium, the compensable elements of damage include: 1) loss of love and affection, 2) loss of society and companionship, 3) impairment of the sexual relationship, 4) loss of performance of material services, 5) loss of financial support, 6) loss of aid and assistance, and 7) loss of fidelity. Sperandeo v. Denny's Inc., 96-328 (La.App. 5 Cir. 10/1/96), 683 So.2d 743; Seagers v. Pailet, 95-52 (La.App. 5 Cir. 5/10/95), 656 So.2d 700; Morris v. Owens-Illinois, *662 Inc., 582 So.2d 1349 (La.App. 2 Cir.1991). Plaintiff is not required to prove every element to establish a compensable claim. Seagers v. Pailet, supra. "Services" are the uncompensated household duties, including help with the educational needs of the children, which the injured spouse is unable to perform due to the injury and which must be obtained at a price from another source. Mathews v. Dousay, supra; Lonthier v. Northwest Ins. Co., supra.
The jury awarded a lump sum of $1,000,000 to Mrs. Morehead. The Moreheads consented to a reduction of her award to $350,000 by the trial court on Ford's motion for new trial. Mrs. Morehead sustained multiple injuries in the accident consisting of lacerations of her arm and elbow which required approximately twelve stitches, broken ribs, and a two inch cut on her left buttock. As established at trial, her special damages, including medical expenses and lost earning capacity, totaled $79,960. Mrs. Morehead was awarded approximately $270,000, the balance of the $350,000 award, for general damages and loss of consortium.
Mrs. Morehead testified regarding her physical injuries and the change in her relationship with Mr. Morehead as a result of the accident. She stated that they purchased the 1992 Ford truck because they planned to travel upon Mr. Morehead's retirement. Since the accident, she has devoted most of her time to the care of Mr. Morehead, including assistance with the catheter, helping Mr. Morehead into and out of his wheelchair, dressing him, brushing his hair, and inserting a suppository for Mr. Morehead at bedtime. Mrs. Morehead wakens every two hours during the night to turn Mr. Morehead. Even with attendant care, Mrs. Morehead's activities will continue to be restricted in the future due to her concern for and assistance with the care of Mr. Morehead.
Mr. Morehead is no longer able to assist Mrs. Morehead with any household chores or yard work, such as feeding the dog, mowing the lawn, planting a garden and performing minor repairs around the house. Nor is Mr. Morehead able to travel with Mrs. Morehead as they did before the accident and as they had planned after Mr. Morehead's retirement.
Tony Morehead, son of the Moreheads, testified that the accident has caused a significant change in his parents' relationship. They are no longer able to travel or pursue hobbies of their own. He stated that Mrs. Morehead spends most of her time caring for Mr. Morehead.
An award may be "disturbed" only to the extent of lowering it to an amount within the range afforded the trier of fact. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Foster v. Lafayette Ins. Co., 504 So.2d 82 (La.App. 2 Cir.1987). Our review of the record indicates that the amount awarded Mrs. Morehead is so high as to constitute an abuse of discretion. Accordingly, the judgment must be amended to lower the award of $350,000 to the highest amount that an appellate court would affirm as reasonable. Holt v. Aetna Cas. & Sur. Co., 28,450 (La.App. 2 Cir. 9/3/96), 680 So.2d 117; Foster v. Lafayette Ins. Co., supra.
In determining the range of awards for loss of consortium, we found that the highest loss of consortium award affirmed by an appellate court was $200,000. In Moore v. Safeway, Inc., 95-1552 (La.App. 1 Cir. 11/22/96), ___ So.2d ___ [1996 WL 684184], the court of appeal affirmed a jury award of $200,000 to Verna Moore for loss of spousal society, service and consortium. Mr. Moore suffered a severe head injury in a fall which rendered him deaf in his right ear, partially deaf in his left ear and unable to attend to his personal needs, drive a car, or perform any household duties. Mr. Moore also sustained brain damage which impaired his orientation, memory, and judgment. He has been diagnosed with both clinical depression and organic brain disorder and has exhibited numerous symptoms of post-concussion syndrome. Experts calculated Mr. Moore's life expectancy to be approximately 36 years. Although Mrs. Moore was the primary caretaker of Mr. Moore at the time of trial, evidence of the cost of 24-hour attendant care was offered to establish the amount of future medical expenses. Despite testimony regarding 24-hour attendant care, the appellate *663 court, in affirming the loss of consortium award, noted that as major caretaker, Mrs. Moore, was restricted for a long period of time.
In the instant case, Mrs. Morehead has clearly established a claim for loss of consortium in addition to her claims for pain and suffering, past medical expenses and loss of earning capacity. However, despite the trial court's great discretion in awarding general damages, we concluded that the $350,000 award to Mrs. Morehead was above the highest amount reasonably within the fact finder's discretion. In the instant case, the jury award to Mr. Morehead included costs of a life care plan which provided for 24-hour attendant care. Although Mrs. Morehead testified at trial that she was the primary caretaker of Mr. Morehead, in light of Mr. Morehead's life expectancy of approximately fourteen years and provision for other caretakers in the award to Mr. Morehead, we find that $350,000 is above the highest amount which could reasonably have been awarded based on Mrs. Morehead's testimony regarding the change in her marital relationship with Mr. Morehead, the loss of services she suffered due to Mr. Morehead's injury, and Mrs. Morehead's relatively minor physical injuries. We find that $250,000 would adequately compensate Mrs. Morehead for special damages of approximately $80,000 and general damages for her pain and suffering and her loss of consortium.
Therefore, we amend the judgment to reflect an award of $250,000 to Mrs. Morehead.

Motion to Strike
The Moreheads filed a motion to strike Ford's reply brief as nonconforming. Ford filed an opposition in response. Apparently, Ford filed a motion to supplement the record or be given leave to raise a certain issue in a reply brief. However, before this court issued a ruling on Ford's motion, Ford filed a reply brief and discussed the testimony of a certain witness. On January 10, 1997, this court issued an order denying Ford's motion. Therefore, the filing of Ford's brief was not an intentional disregard of this court's order. This court can simply disregard the information in the reply brief without striking the brief. For that reason, we deny the Moreheads motion to strike.

CONCLUSION
For the foregoing reasons, the jury verdict and judgment rendered therefrom are amended and, as amended, affirmed. Costs are assessed to Ford Motor Company.
AMENDED and AFFIRMED.
HIGHTOWER, J., dissents with written reasons.
HIGHTOWER, Judge, dissenting.
Considering Tamny's prior testimony in two depositions, I cannot escape the conclusion that Ford indeed found itself ambushed at trial. After repeatedly stating in deposition that the intermediate steering shaft had been "pulled apart" (and reassembled) before its installation in the truck, plaintiff's expert simply hypothesized at trial that the shaft "had been substantially failed beforehand."
This not only formulated a substantial change of theory concerning how the accident occurred, but also presented a previously undisclosed opinion that defendant understandably remained unprepared to confront ___ especially when the revelation came forth only after the expert himself had discarded all of the steering system components.
The affirmance, of course, in no manner seeks to rectify the resulting prejudice other than by amending the consortium award.
Respectfully, I must dissent.

APPLICATION FOR REHEARING
Before MARVIN, C.J., and HIGHTOWER, BROWN, STEWART and PEATROSS, JJ.
Rehearing denied.
NOTES
[1] R. 909.
[2] The deposition of Mr. Riccitelli was introduced at trial by the Moreheads.
[3] The Louisiana Supreme Court reversed the ruling of this court on the issue of liability in Pitre v. Louisiana Tech University, 95-1466 (La.5/10/96), 673 So.2d 585, rehearing denied (La. 6/28/96).