JUDE G. GRAVOIS, Judge.
|2Appellants, Marjorie Susan Sirgo Am-ick and Lester E. Amick, III, appeal a trial court judgment that found Marjorie Fernandez Sirgo’s October 13, 2005 testament to be null and void because she lacked testamentary capacity at the time she executed the testament, and that further ordered that Mrs. Sirgo’s September 17, 2001 testament be probated. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY

Marjorie Fernandez Sirgo (“Mrs. Marjorie”) died on February 20, 2010. She had been married but once and then to Joseph M. Sirgo, Sr., who predeceased her. Of their marriage, four children were born. Two of the children, defendant, Marjorie Susan Sirgo Amick (“Susie”), and plaintiff, Rene G. Sirgo (“Rene”), survived their mother. Mrs. Marjorie was predeceased by her other two children, Joseph M. Sir-go, Jr. and Gail Sirgo Loga (“Gail”). Darnell Loga Bagley (“Darnell”), Gail’s only surviving daughter, is also a plaintiff in this proceeding.
UMrs. Marjorie was 95 years old at the time of her death. From 2002 until her death in 2010, she lived in three different nursing homes, during which time she suffered from Parkinson’s disease and diabetes. On September 17, 2001, while Mrs. Marjorie still lived at her home, she executed a will in which she left the residual of her estate equally to her surviving children (Gail, Susie, and Rene), and to Darnell, if her mother, Gail, predeceased her. In 2002, Mrs. Marjorie began living at Chateau Living Center in Kenner, Louisiana. She stayed there until August 2005, when she evacuated with Susie and her husband, Lester E. Amick, III (“Lester”) to Mississippi due to Hurricane Katrina. On October 13, 2005, while Mrs. Marjorie was a resident of Poplar Springs Nursing Center in Meridian, Mississippi,. Susie and Lester took her to execute another will before Beverly Hubnall, a Notary Public who was employed by a CPA firm that did work for Susie and Lester. Mrs. Marjorie’s October 13, 2005 will left her entire estate to Susie, unless Susie predeceased her, in which case Lester would receive Mrs. Marjorie’s entire estate. The will *835 also appointed Susie as the independent executrix of Mrs. Marjorie’s estate.
On February 23, 2010, Susie filed a petition to probate her mother’s October 18, 2005 will and also prayed to be appointed as the independent executrix of her estate. On February 26, 2010, the court ordered that the October 13, 2005 will be filed, recorded, and executed according to law, and that such order was to have the effect of probate of the testament. The court also confirmed the appointment of Susie as the independent executrix of the estate.
On April 12, 2010, Rene (Mrs. Marjorie’s son) and Darnell (Mrs. Marjorie’s granddaughter) (collectively “plaintiffs”) filed a petition to annul the probated testament, or in the alternative, to have the will declared invalid due to undue influence. In their petition, plaintiffs claimed that at the time Mrs. Marjorie |4executed the October 13, 2005 will, she lacked testamentary capacity, or in the alternative, she was subjected to undue influence by Susie and Lester (collectively, “defendants”). Plaintiffs requested that the October 13, 2005 will be found null and void, and that Mrs. Marjorie’s assets be distributed according to the terms of her September 17, 2001 will, which they presented for probate with their petition. By court order dated April 30, 2010, a copy of the September 17, 2001 will was maintained in the succession record, while the original was stored in the Clerk of Court’s vault until further orders of the court. On May 4, 2010, defendants filed an answer to the petition.
A bench trial was conducted on September 17-18, .2013 and October 15, 2013. Following the trial, the parties submitted post-trial memoranda. On December 4, 2013, with written reasons for judgment, the trial court found that plaintiffs proved by clear and convincing evidence that Mrs. Marjorie lacked testamentary capacity at the time she executed the October 13, 2005 will. Thus, the October 13, 2005 will was declared null and void. The court further ordered that Mrs. Marjorie’s September 17, 2001 will be probated and that Mrs. Marjorie’s assets be distributed in accordance with its terms and conditions. On December 18, 2013, defendants timely filed a motion for an appeal.
On appeal, defendants present 14 assignments of error and 12 issues for review. Many of the assignments and issues pertain to the same topics. Thus, to simplify matters, the assignments of error have been consolidated into broader categories as hereinafter set forth.
| ¿TESTAMENTARY CAPACITY[1]
Through various assignments of errors, defendants first contend that the trial *836 court erred in finding that Mrs. Marjorie lacked testamentary capacity at the time she executed the October 13, 2005 will. They argue that the trial court erred in finding that plaintiffs overcame the presumption that a testator has testamentary capacity because clear and convincing evidence that Mrs. Marjorie lacked testamentary capacity was not presented. They specifically argue that the trial court erred when it relied on the testimony of witnesses who did not see Mrs. Marjorie for some time before she executed the October 18, 2005 will. According to defendants, the court should have relied on the testimony of the witnesses who were present at the time the will was executed. They also argue that the court erred in finding the notary’s testimony suspect. Further, they argue that the court’s conclusion that the will was not explained to Mrs. Marjorie was erroneous.
Under Louisiana Civil Code article 1471, the capacity to donate mortis causa must exist at the time the testator executes the testament. To have that capacity, a person must be able to “comprehend generally the nature and consequences of the disposition that he is making.” La. C.C. art. 1477. Testamentary capacity is presumed, and whoever is opposing such capacity bears |fithe burden of defeating the presumption by a showing of clear and convincing evidence to the contrary. In re Succession of Barattini, 11-752 (La.App. 5 Cir. 3/27/12), 91 So.3d 1091, 1095. “The issue of capacity is factual in nature.” Id. Medical evidence, other expert testimony, and lay witness testimony may all be considered when evaluating mental capacity, as there is no “litmus paper” test. Id. Since mental capacity is a factual question, the trial court’s finding will not be disturbed on appeal unless manifestly erroneous. Id.
In the present case, plaintiffs presented both the testimony of lay witnesses and certified records from Poplar Springs Nursing Center to show that Mrs. Marjorie lacked testamentary capacity at the time she executed the October 13, 2005 will. Defendants argue rather that Mrs. Marjorie was more than capable of understanding what she was doing and the consequences of her actions when she executed the will. Upon review, we find that the trial court did not err in determining that Mrs. Marjorie did not understand the nature and consequences of her actions at the time she executed the subject will.
As the trial court correctly found in its written reasons for judgment, all witnesses, except defendants’,' consistently testified that Mrs. Marjorie was “out of it” in the months preceding October 13, 2005, and confirmed that decedent often expressed a desire to leave her estate to all of her surviving children.
The trial court specifically found the testimony of plaintiffs’ witnesses Mary Sirgo Chauvin (“Mary”) and her stepson Shawn Sirgo (“Shawn”) “convincing,” as neither had any stake in the succession proceeding. Mary had been married to Mrs. Marjorie’s deceased son, Joseph M. Sirgo, Jr. She testified that she and Mrs. Marjorie were very close, especially after Mary’s husband died. ' When Mrs. Marjorie entered Chateau Living Center, her body *837 began to fail, but her mind was still sharp. However, as time passed, she started deteriorating mentally. • 17According to Mary, toward the end of her stay at Chateau Living Center, she did not think that Mrs. Marjorie knew who she was or who others were. She also was not able to talk much.
While Mrs. Marjorie resided at Poplar Spring Nursing Center in Mississippi, Mary visited with her four or five times, the first visit being sometime during September 2005. During their visit, Mrs. Marjorie slept a lot. When she was awake, she did not say or do anything that made Mary believe she knew where she was or who Mary was. She testified that when she saw Mrs. Marjorie in Mississippi, she believed that she was not “mentally capable of making sound business decisions.” Additionally, Mary testified that Mrs. Marjorie never expressed any desire that Susie should receive an extra portion or an additional share of her estate.
Shawn, who had no stake in the succession proceeding, testified that Mrs. Marjorie had always been of sound mental health, but over time, she became “less and less aware of her environment.” While she was at Chateau Living Center, he visited with her at least twice a week. According to Shawn, during the summer of 2005, Mrs. Marjorie was “nonexistent as far as being cognizant of who was there, what was going on, [or] where she was.” This was the ease even though he visited her at different times during the day. Following that summer, Shawn did not see his grandmother again. Finally, he testified that he never heard or observed any intent on Mrs. Marjorie’s part to disinherit either Rene or Darnell.
The court also heard the testimony of Rene and Darnell, and also Rene’s wife, Marleen Sirgo. They testified that before Mrs. Marjorie entered Chateau Living Center, she expressed fear that Susie and Lester wanted everything she owned and wanted her to sign paperwork. They also testified that by the end of her stay at Chateau Living Center, Mrs. Marjorie did not possess the ability to | scomprehend her surroundings. Darnell testified that Mrs. Marjorie never expressed any desire to disinherit her or Rene.
Both Rene and Darnell visited with Mrs. Marjorie while she was at Poplar Springs Nursing Center. According to Rene, when he saw Mrs. Marjorie for the first time after her move to Mississippi, she was just lying in her bed, unresponsive. She made no indication that she understood who he was. Darnell testified that when she visited Mrs. Marjorie in Mississippi in October 2005, Mrs. Marjorie did not recognize her, nor was she really communicating.
Defendants argue that the trial court should have credited the testimony of the only witnesses who were present at the execution of the will: Susie, Lester, and the notary, Ms. Hubnall. These witnesses presented a very different picture of Mrs. Marjorie’s mental capacity at the time in question.
Susie testified that she oversaw all of her mother’s medical care. Mrs. Marjorie was diagnosed with Parkinson’s disease and diabetes, and the Parkinson’s affected her ability to swallow and her speech. To her knowledge though, Mrs. Marjorie was never diagnosed with any type of dementia or mental incapacity. Susie acknowledged that while at Chateau Living Center, Mrs. Marjorie suffered from frequent urinary tract infections that would lead to confusion, hallucinations, and paranoia. After she was treated for the infections, her mental capacity would improve. She would also often not get her insulin timely, which at one point .resulted in her reaching an unconscious state. This would also be routinely remedied.
*838 .Nonetheless, according to Susie, at the time they evacuated to Mississippi, Mrs. Marjorie was coherent and even helped her pick out clothes to pack for the trip. While Mrs. Marjorie was at Poplar Springs Nursing Center, she received much better care, was cognizant, would respond to Susie, and knew who she was. | nSusie testified that during that time, she had the power of attorney that Mrs. Marjorie had given to Rene revoked because she and her husband had full responsibility for Mrs. Marjorie at that time. According to Susie, Mrs. Marjorie knew she was taking care of her and wanted to provide for that. After Susie informed Mrs. Marjorie that- she had no money left and only had her home and her personal belongings, Mrs. Marjorie told Susie that she wanted her to have those assets. Susie testified that the new will was Mrs. Marjorie’s idea. After Mrs. Marjorie made this request, she contacted a lawyer, Janice Campbell, who drew up the will, but Susie did not mention the new will again until her mother brought it up. On the day Mrs. Marjorie brought it up again, they took her to execute the will. On that day, Mrs. Marjorie was more awake and “rose to the occasion.” Susie believed that her mother understood what she was doing when she signed the will.
On cross-examination, Susie could not answer when was the last time her mother managed her own affairs. She also admitted that neither she nor her husband ever attempted to explain to Mrs. Marjorie the consequences of the new will. Finally, though at her deposition she testified that it was Ms. Hubnall who read the will to Mrs. Marjorie, at trial she could not recall if it was Lester or Ms. Hubnall who read the will to Mrs. Marjorie.
Lester testified that Mrs. Marjorie was communicative while at Chateau Living Center. She knew. who he was and seemed to be aware of what was going on around her. While Mrs. Marjorie was at Poplar Springs Nursing Center, he did not visit her as much, but she still recognized and responded to him when he visited her. He was not present when Mrs. Marjorie said she wanted to sign a new will. On October 13, 2005, he took Mrs. Marjorie to execute her new will. He testified that he believed the notary read the will to Mrs. Marjorie. Before she |10signed the will, he asked her if she understood it and also asked twice if she wanted to sign it. He believed that Mrs. Marjorie understood what she was signing, but he had no recollection of anyone explaining the consequences of the will to her.
Ms. Hubnall, the Notary Public before whom the will was executed, also testified at trial. Defendants argue that the trial court erred in finding Ms. Hubnall’s testimony suspect. However, upon review, we find no error in the trial court’s finding that Ms. Hubnall’s testimony does not support a conclusion that Mrs. Marjorie understood the nature and effects of the October 13, 2005 will. Mrs. Hubnall worked for the CPA firm which handled the Am-icks’ tax returns for at least the preceding 20 years. She met Mrs. Marjorie briefly on only two occasions: at the signing of the revocation of the power of attorney, and at the signing of the October 13, 2005 will. On October 13, 2005, she met Mrs. Marjorie at the car, where the will was executed. Prior to execution of the will, Ms. Hubnall had a conversation with Mrs. Marjorie. However, as the trial court pointed out, there were inconsistencies between her trial testimony and her deposition testimony regarding this conversation. At the trial, Ms. Hubnall testified she could not remember everything they discussed, but did recall that she asked Mrs. Marjorie how many children she had, who they were, and who the president was. She testified that Mrs. Marjorie was able *839 to answer all of those questions. At her deposition on May 22, 2013, Ms. Hubnall testified that the only conversation they had was when she asked if Mrs. Marjorie “knew these people,” referring to Susie and Lester.
Further, Ms. Hubnall testified that neither she nor anyone else present explained the consequences, of the will to her. She also testified that had she been aware of the nursing home records noting Mrs. Marjorie’s impaired condition, she | nwould not have notarized the will. Finally, contrary to Lester’s testimony, Ms. Hubnall testified that it was Lester who read the will to Mrs. Marjorie, not herself.
Defendants rely on Succession of Mack, 585 So.2d 461, 464 (La.App. 4 Cir.1989), which held that the testimony of a notary holds a special credence when testamentary capacity is disputed. However, in Mack, the notary was an attorney who knew the testator for many years, notarized two previous wills, and questioned the testator about the consequences of the will. Id. Thus, Mack is distinguishable from the instant case. We accordingly find no error in the trial court’s finding that Ms. Hubnall’s testimony was not credible.
It is clear that the trial court was presented with conflicting testimony regarding Mrs. Marjorie’s mental capacity at the time she executed the October 13, 2005 will. In Barattini, supra, the court noted that “[w]hen factual findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard of review demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.” Bar-attini at 1095, citing Dufresne v. Dufresne, 08-215. (La.App. 5 Cir. 9/16/08), 992 So.2d 579. Considering the broad discretion given the trial court in determining the credibility of witnesses and the broad discretion the court has in determining the factual issue of mental capacity, we find there is a reasonable basis in the record for the trial court’s finding that Mrs. Marjorie lacked the testamentary capacity to execute the October 13, 2005 will. These assignments of error are without merit.
| ^introduction and interpretation OF POPLAR SPRINGS NURSING CENTER RECORDS[2]
Defendants also argue that the trial court erred in its interpretation of Poplar Springs Nursing Center records and also erred in relying on the opinion testimony of a lay witness, Juliet Bartholomew Domi-ny, to interpret those records.
In addition to the testimony of the witnesses, the trial court relied on Poplar Springs Nursing Center records to support the finding that Mrs. Marjorie lacked testamentary capacity at the time she executed the October 13, 2005 will. Numer *840 ous notes throughout the medical records indicate that Mrs. Marjorie suffered from cognitive impairment and lacked the ability to make even small decisions. When Mrs. Marjorie was admitted to Poplar Springs Nursing Center in September 2005, the nurse’s notes state that she had “cognitive impairment [as evidenced by] moderately impaired decision making skills with short term memory deficit noted.” On October 21, 2005, her social progress notes contain a look-back assessment for the period of October 3, 2005 through October 10, 2005. During that period of time, it is noted that Mrs. Marjorie had “severally impaired cognitive skills for daily decision making [as evidenced by resident] rarely or never makes own decisions.” It also noted that Mrs. Marjorie suffered from “short term and long term memory problemfs]” and that she was unable to recall the current season, the location of her own room, or the fact that she was in a nursing facility. A look-back assessment for the period of September 21, 2005 through September 11S28, 2005 also notes Mrs. Marjorie’s cognitive impairments and short term and long term memory problems.
There are additional- nurse’s notes that indicate Mrs. Marjorie had times of alertness. On appeal, defendants argue the trial court should have recognized that a testator can have lucid intervals. However, the nurse’s note for October 12, 2005, the day prior to the execution of .the will, states that the staff had to anticipate most of Mrs. Marjorie’s wants and needs.
At trial, plaintiffs submitted the deposition testimony of Juliet Bartholomew Dominy regarding these records. Mrs. Dominy currently is a licensed master social worker. In 2005, while she was in school for social work, she worked as a social service designee at Poplar Springs Nursing Center. Defendants argue that the trial court should not have relied on Mrs. Dominy’s opinion testimony in interpreting the nursing home records since she did not testify as an expert and had no independent memory or recollection of Mrs. Marjorie. According to defendants, Mrs. Dominy was not qualified to testify as to the meaning of anything in the nursing home records.
The opinion testimony of a lay witness is limited to opinions or inferences rationally based on the perceptions of the witness and helpful to a clear understanding of his testimony or the determination of a fact in issue. La. C.E. art. 701. A lay witness may give opinion testimony “based on his training, investigation, perception of the scene, and observation of physical evidence.” Rideau v. State Farm Mutual Automobile Insurance Company, 06-0894 (La.App. 1 Cir. 8/29/07), 970 So.2d 564, 572, writ denied, 07-2228 (La.1/11/08), 972 So.2d 1168. Further, the trial court has broad discretion in evidentiary rulings, and absent a clear abuse of that discretion, its determinations will not be disturbed. Id.
114Mrs. Dominy’s duties as a social services designee included admissions, assessments, discharge planning, family contacts, mental assessments, and group therapy for residents. She testified that the records from Poplar Springs Nursing Center were records she either created or assisted in creating. Though she could not specifically remember Mrs. Marjorie, she did recall that Mrs. Marjorie was not with a group of evacuees who arrived at the same time from Waveland, Mississippi. Also, after being shown Mrs. Marjorie’s obituary with her picture, she stated that she remembered her face.
Mrs. Dominy’s testimony focused on how mental evaluations were handled at Poplar Springs Nursing Center. She explained the process for determining if a patient had short term or long term memory problems. To test for short term *841 memory, the patient would be asked to recall what she had for breakfast or if she talked to her daughter. To test for long term memory, the patient would be asked where she grew up or just general history questions. She also testified that an assessment concerning cognitive impairments had to do with disorganized thinking.
Mrs. Dominy did not create the look-back assessment for the period of October 3, 2005 through October 10, 2005; however, she testified as to how she would reach an assessment that a patient was unable to recall the current season, the location of her own room, or the fact that she is in a nursing facility. She would just ask the patient if she knew where she was and where her room was. Also, Mrs. Dominy was asked to explain what factors she as a social worker or any nurse would use to reach an assessment that the “staff anticipates most wants and needs.” She said this refers to a patient’s daily needs, such as brushing hair or just taking care of oneself. These were activities for daily living that the staff would have to anticipate for the patient. In her opinion, Mrs. Marjorie would not have |1fihad the capacity to comprehend and understand the consequences of signing the will.
Upon review, we find the trial court did not err in allowing the testimony of Mrs. Dominy. She was the social services des-ignee at the time Mrs. Marjorie was a resident of Poplar Spring Nursing Center. She was well aware of the procedures the nursing home used in assessing patients. Though she did not create all of the records, she did assist in creating them, and she did recognize Mrs. Marjorie when she saw her picture. Her testimony helped in determining Mrs. Marjorie’s mental capacity during the relevant time period.
We further find no error in the trial court’s interpretation of Poplar Springs Nursing Center records. The court considered the records as a whole and found that they supported the conclusion that Mrs. Marjorie suffered from “severely impaired cognitive function” at the time she executed the subject will. Based on our review of the records, we find that there was a reasonable basis to support such a conclusion by the trial court.
These assignments of error are without merit.
UNTIMELY DISCLOSURE OF WITNESSES[3]
Defendants also claim that the trial court should not have allowed the testimony of Shawn and Marleen because neither of them were listed on plaintiffs’ pre-trial order. According to defendants, the court issued a preliminary order that provided that only witnesses listed on the pre-trial order would be allowed to testify. Defendants argue they were unfairly prejudiced by the court’s allowing the testimony of both of these witnesses because they were not prepared to impeach their testimony.
| ^Modification of a pre-trial order is within the sole discretion of the trier of fact. Such a decision will be upheld unless there is an abuse of discretion. Gordon v. Levet, 96-600 (La.App. 5 Cir. 1/15/97), 688 So.2d 57, 62, writ ■denied> 97-0406 (La.4/4/97), 692 So.2d 418.
Marleen was not listed on either of plaintiffs’ witness and exhibit lists or in *842 the pre-trial order. Defendants objected when she was called to testify at trial. Plaintiffs admit that Marleen was not listed on the witness and exhibit lists, but argued that such was just an oversight. The trial court considered the objection, but allowed Marleen to testify, noting that she was a family member and there did not appear to be any harm in allowing her to testify. However, the trial court did allow a recess before Marleen took the stand so that they could properly prepare. Given these facts and the trial court’s broad discretion, we find no error in the trial court’s decision allowing Marleen to testify.
Defense counsel also objected to Shawn’s testimony at trial. Defendants admitted that Shawn was disclosed a week prior to the trial, and they objected thereto by email. In response, plaintiffs argued that defendants conducted no depositions prior to trial even of witnesses they knew about. After considering their arguments, the trial court allowed Shawn to testify. At the close of the trial, defendants made an oral motion to strike Shawn’s testimony. They introduced documents from both the Louisiana Supreme Court and Tennessee courts reprimanding and censuring Shawn for ethical violations. On appeal, they argue that Shawn testified at trial that he was a practicing lawyer in both Tennessee and Louisiana. If they had known that he was going to testify prior to trial, defendants argue that they could have obtained this information earlier and questioned him about it, which could have affected his credibility.
| i7A review of the record shows that an amendment to the witness and exhibit list naming Shawn as a witness was filed on September 16, 2013, a day before trial. Though it was late, defendants admitted at trial they had prior notice that plaintiffs anticipated calling Shawn to testify. Therefore, given the trial court’s broad discretion in such matters, considering that defendants did have some prior notice, and since the trial court had an opportunity to review the records relating to Shawn’s ethical violations prior to ruling, we find no error in the trial court’s ruling to allow Shawn to testify.
This assignment of error is without merit.
PROBATE OF THE SEPTEMBER 17, 2001 WILL[4]
The trial court’s judgment orders the probate of Mrs. Marjorie’s September 17, 2001 will and orders that Mrs. Marjorie’s assets be distributed in accordance with its terms and conditions. In defendants’ final assignment of error, they contend that the trial court erred in ordering the probate of Mrs. Marjorie’s September 17, 2001 will.
On April 12, 2010, plaintiffs filed their petition to annul the October 13, 2005 probated will. Within that petition, plaintiffs presented the September 17, 2001 will for probate. On April 30, 2010, the Clerk of Court was ordered to file a copy of the September 17, 2001 will into the succession record and keep the original of the same in his vault for safekeeping.
According to defendants, if this Court affirms the trial court’s decision finding Mrs. Marjorie’s October 13, 2005 will null and void, this Court should not probate the September 17, 2001 will, but should in *843 stead remand the case to the trial 11scourt to give the parties an opportunity to submit any other will Mrs. Marjorie may have executed. Louisiana Code of Civil Procedure article 2853 states that if a person is in possession of a document purporting to be the testament of a deceased person, even if that person believes the document is not valid or doubts its validity, it should be presented to the court with a petition praying it be filed into the succession proceedings record. At the time of the trial, Mrs. Marjorie’s September 17, 2001 will was the only other document submitted for probate and filed into the succession proceedings.[5] Thus, we find no error in the court’s determination that Mrs. Marjorie’s September 17, 2001 will should be probated. Any and all rights anyone may have according to law to challenge such will (or any codicil thereto), or any other wills Mrs. Marjorie may have executed, are obviously reserved.

CONCLUSION

For the foregoing reasons, the judgment of the trial court under review is affirmed.

AFFIRMED.

.Under this heading, we address the following assignments of error (numbered in accordance with appellants’ brief), to-wit:
1. The trial court erred in finding that Mrs. Marjorie lacked testamentary capacity.
2. The trial court erred in failing to recognize that it is presumed that a testator has testamentary capacity, and that the evidence has to be sufficient to overcome the presumption.
3. The trial court erred in finding that there was sufficient evidence to determine that Mrs. Marjorie lacked testamentary capacity.
4. The trial court erred in finding that the evidence presented by plaintiffs met the clear and convincing evidence standard.
5. The trial court erred in basing her findings on witnesses that could only testify as to Mrs. Marjorie’s condition at earlier times, and who had not seen Mrs. Marjorie at the time of the execution of the last will and testament.
6. The trial court erred in failing to recognize that a testator can have lucid intervals, and during a lucid interval, the testator can have the mental capacity to execute a last will and testament. *836 7. The trial court erred in disregarding the testimony of the only witnesses who were present at the time of the execution of the will.
12. The trial court erred in concluding that the testimony of the Notary is suspect because she had a long-time business relationship with Lester Amick.
13. The trial court erred in concluding that the last will and testament was not explained to the testator.

. Under this heading, we address the following assignments of error (numbered in accordance with appellants’ brief), to-wit:
9. The trial court erred in relying on the opinion testimony of a lay witness to interpret nursing home records, and who expressed an opinion about Mrs. Marjorie’s testamentary capacity based solely on said nursing home records, and who had no independent memory or recollection of Mrs. Marjorie.
ic). The trial court erred in admitting into evidence the deposition and opinions of Juliet Bartholomew, who was not tendered or qualified as an expert, but who gave medical testimony and opinion testimony.
11. The trial court erred in her interpretation of nursing home records that included notes that Mrs. Marjorie was awake and alert, but found that those notes did not support defendants' representations.

. Under this heading, we address the following assignment of error (numbered in accordance with appellants’ brief), to-wit:
8. The trial court erred in allowing the testimony of two witnesses who were not timely disclosed to defendants, in contradiction to the court's own pre-trial orders.

. Under this heading, we address the following assignment of error (numbered in accordance with appellants' brief), to-wit:
14. The trial court erred in ordering the September 17, 2001 testament to be probated and the assets to be distributed in accordance therewith because there was no evidence presented to establish that the September 17, 2001 will was the most recent will, or that it had not been revoked by a superceding [sic ] will.

. Plaintiffs submitted a February 18, 2005 codicil to the September 17, 2001 will as an exhibit at trial, but it was never presented to the court for probate.